MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:    2016 ME 171
Docket:      BCD-14-433
Argued:      September 17, 2015
Decided:     November 29, 2016

Panel:       SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HJELM, JJ.

FORD MOTOR COMPANY

v.

DARLING'S et al.

HJELM, J.

[¶1]  This is the second appeal in a long-running dispute arising out of the franchise relationship between Ford Motor Company and Darling's, an automobile dealer located in Bangor.  *See Ford Motor Company v. Darling's* (*Ford I*), 2014 ME 7, 86 A.3d 35.  The relationship is subject to the Business Practices Between Motor Vehicle Manufacturers, Distributors, and Dealers Act (Dealers Act), 10 M.R.S. §§ 1171 to 1190-A (2015).[1]  In *Ford I*, we affirmed the portion of a judgment entered in the Business and Consumer Docket (BCD) (*Nivison, J.*) that concluded that Ford violated the Dealers Act by failing to provide Darling's with proper notice of a franchise modification.  We vacated

---

[1]  All citations to the Dealers Act are made to the statute currently in effect, 10 M.R.S. §§ 1171 to 1190-A (2015).  The Dealers Act has been amended since this case was initiated in 2006, though not in any way that affects this appeal.  *See, e.g.*, P.L. 2015, ch. 329, §§ C-1 to C-4 (emergency, effective July 12, 2015) (codified at 10 M.R.S. §§ 1174(3)(U)-(W) (2015)).

an award of damages that had been issued to Darling's by the Maine Motor Vehicle Franchise Board, however, because the Board does not have jurisdiction over that issue. Accordingly, we remanded the matter for a determination of damages by a jury.

[¶2] On remand, following a two-day jury trial, the court (*Murphy, J.*) entered a judgment awarding Darling's damages of $154,695.81 based on Ford's violation of the statutory notice provision. Darling's and the Maine Automobile Dealers Association (MADA) now appeal from that decision, arguing that the court erred by limiting Darling's damages claim to a 270-day period and by reducing those damages based on certain payments that Darling's received from Ford. Ford cross-appeals, arguing that if we remand this matter for a new trial, Ford should be entitled to present evidence that it had "good cause" to modify the franchise, which would either further limit or foreclose any recovery by Darling's.[2] We affirm the judgment in part but vacate in part and remand to the BCD for a new trial on the issue of damages.

---

[2] Ford also argues that if this matter is remanded, Ford should be entitled to present evidence that Darling's had actual notice of the proposed franchise modification and failed to mitigate its damages by filing a protest with the Board. This argument is not persuasive and we do not address it further. *See Ford Motor Company v. Darling's* (*Ford I*), 2014 ME 7, ¶¶ 30-31, 86 A.3d 35 (concluding that strict compliance with the notice requirement established in 10 M.R.S. § 1174(3)(B) is mandatory).

## I. BACKGROUND

[¶3]  The following facts, set out in part in *Ford I*, 2014 ME 7, 86 A.3d 35, bear on the issues raised in this appeal.

[¶4]   Ford Motor Company, a manufacturer/franchisor, sells automobiles through contractual agreements with dealers/franchisees such as Darling's.  In 1989, Darling's and Ford entered into a service and sales agreement under which Darling's became an authorized Ford dealer and obtained the right to sell Ford vehicles and products.

[¶5]  In 2000, Ford created the Blue Oval Certified (BOC) program, which provided a special certification to dealers that met customer approval standards and entitled those dealers to receive a 1.25% cash bonus on the retail price of each vehicle the dealer sold.  Darling's became certified as a BOC dealer in 2001.  In August 2004, Ford announced that it would discontinue the 1.25% payments effective April 1, 2005.[3]  After Ford stopped making BOC payments, it introduced new incentive programs including an "Accelerated Sales Challenge" (ASC).

---

[3]   Although, in *Ford I*, 2014 ME 7, ¶ 5, 86 A.3d 35, we stated that the BOC *program* was terminated, the record now before us reveals that certain aspects of the BOC program actually continued after April 1, 2005; Ford terminated only that aspect of the program providing 1.25% incentive payments to certified dealers on the purchase price of each vehicle sold.

[¶6]  In response to Ford's actions, in December 2006 Darling's filed a twelve-count complaint with the Maine Motor Vehicle Franchise Board, *see* 10 M.R.S. § 1188(1), alleging that Ford had committed various violations of the Dealers Act.  Darling's alleged, among other things, that Ford's termination of BOC payments constituted a modification of the franchise that substantially and adversely affected Darling's rights, obligations, investment or return on investment, and that Ford therefore violated 10 M.R.S. § 1174(3)(B) by failing to provide Darling's with proper notice of the modification.  Because of Ford's statutory violation, Darling's sought damages equal to the loss of what it described in its complaint as contract-based BOC payments that Ford failed to make.

[¶7]  In May 2008, the Board issued a decision concluding that Ford violated the Dealers Act because it had not given Darling's the type of notice of the decision that was statutorily required in order to discontinue the BOC payments.  The Board imposed a civil penalty of $10,000 and awarded Darling's damages of $145,223.08.  Those damages represented the amount of BOC payments that Darling's would have earned during a 270-day period beginning on April 1, 2005, when Ford stopped making the payments, less the amount that Darling's had earned through other incentive programs,

including the ASC program, during that same period. The Board arrived at the 270-day damages period by combining the ninety-day period within which a dealer may file a protest with the Board after receiving notice of a manufacturer's proposed modification of the franchise with the subsequent 180-day period within which the Board must decide the matter. *See* 10 M.R.S. § 1174(3)(B).

[¶8] Pursuant to M.R. Civ. P. 80C, both Ford and Darling's filed separate petitions in the Superior Court for review of the Board's decision.[4] Among other things, Ford sought modification and reversal of the Board's decision regarding the adequacy of Ford's notice to Darling's, and Darling's argued that the Board erred by limiting its recovery to damages incurred during the 270-day statutory period and also by offsetting those damages by the amount Darling's received through other sales incentive programs. The petitions were consolidated and transferred to the BCD. There, MADA sought and was granted intervenor status.

[¶9] In March 2011, a jury trial was held on the factual question of whether discontinuation of the BOC payments constituted a modification of

---

[4] In their respective petitions for judicial review, Ford and Darling's named the Secretary of State as a party because, pursuant to 10 M.R.S. § 1187(7), the Secretary of State is responsible for operating and administering the Board. *Ford I*, 2014 ME 7, ¶ 8 n.4, 86 A.3d 35. The Secretary of State did not participate in either the 2012 appeal or the present appeal.

the franchise that had a substantial and adverse effect on Darling's investment or return on investment, and the jury returned a verdict favorable to Darling's. By agreement of the parties, the court (*Nivison, J.*) did not submit the issue of damages to the jury but rather exercised its appellate jurisdiction and reviewed the administrative record to determine whether that record supported the Board's damages award. Based on the jury's verdict and the court's legal conclusion that Ford failed to provide notice to Darling's in a way that complied with section 1174(3)(B), the court issued orders affirming both the Board's award of one civil penalty pursuant to 10 M.R.S. § 1171-B(3) and the Board's damages award.

[¶10] On appeal by Darling's and MADA, and cross-appeal by Ford, we affirmed most aspects of the judgment, including the conclusions that Ford's termination of BOC payments was a franchise modification that triggered the ninety-day notice requirement under the Dealers Act, and that Ford did not satisfy that requirement. *See Ford I*, 2014 ME 7, ¶¶ 27, 31, 86 A.3d 35. We held, however, that pursuant to 10 M.R.S. § 1188, the Board lacks jurisdiction to award damages for violations of the Act. *Id.* ¶¶ 43, 46. We therefore vacated that portion of the judgment affirming the Board's award of damages

and remanded the matter to the BCD for a determination of damages by a jury. *Id.* ¶¶ 3, 48.

[¶11]  Despite the Board's finding, which we affirmed in *Ford I*, that Ford had not provided Darling's with effective notice of the franchise modification, Ford chose to not cure the problem.  During the remand proceedings, Ford explained to the court that for "business reasons" it had not given Darling's statutorily sufficient notice so as to not invite similar challenges from other dealers.  The consequence of Ford's continuing refusal to provide the required notice was that Darling's did not have an opportunity to file a protest, which would have triggered the Board's responsibility to determine whether there was good cause for the proposed franchise modification.  *See* 10 M.R.S. § 1174(3)(B).  Nonetheless, Ford argued that it should be entitled to present evidence of whether it had good cause to modify the franchise as a part of the trial on the issue of damages.

[¶12]  In response, Darling's moved in limine for a court order precluding Ford from arguing that it had good cause to modify the franchise. The court granted Darling's motion, concluding that whether Ford had good cause for the termination was not relevant to the determination of damages because Ford had not satisfied the statutory prerequisite necessary to raise

that issue—namely, providing Darling's with proper notice of the modification. The court further concluded that "[a]llowing Ford to adjudicate the question of 'good cause' absent compliance with section 1174(3)(B)'s notice requirement would run counter" to the purpose of the Dealers Act.

[¶13] Additionally, the court issued a pretrial ruling that, as a matter of law, Darling's damages arising from Ford's violation of the statutory notice provision are limited to the 270-day period following the discontinuation of BOC payments on April 1, 2005. The court also ruled that the jury would decide as a factual issue whether payments made under new sales incentive programs were a substitute for the discontinued payments under the BOC program, and that Ford was entitled to present evidence on that issue.

[¶14] A two-day jury trial was held in September 2014, where the parties stipulated that if the BOC payments had continued for the 270-day period beginning April 1, 2005, Darling's would have received the sum of $212,570.81 from Ford, and that during that same period, Darling's received incentive payments of $57,875 under the ASC program. The court instructed the jury that Ford's liability had already been established, but that Darling's had the burden of proving damages resulting from Ford's statutory violation.

The court also instructed the jury on the issue of substitute payments as an offset to Ford's discontinuation of payments under the BOC program.

[¶15]   The jury returned a verdict that determined gross damages, consistent with the parties' stipulation, equivalent to the amount of BOC payments that Ford did not pay Darling's for 270 days.   The jury also found that during that period, Darling's received incentive payments of $57,875 under the ASC program, and that those payments were a substitute for the BOC payments.   Based on the jury's findings, the court issued a judgment reducing the gross damages awarded to Darling's by the amount it received under the ASC program, for a net damage award of $154,695.81.   Darling's and MADA appealed, and Ford cross-appealed, pursuant to 14 M.R.S. § 1851 (2015) and M.R. App. P. 2.

## II.  DISCUSSION

[¶16]   The sole issue on appeal is determining the proper analysis to calculate any damages made available pursuant to the Dealers Act arising from Ford's violation of the notice requirement established in 10 M.R.S. § 1174(3)(B).[5]  Questions of statutory interpretation and the proper measure

---

[5]  None of the parties argues that *Ford I* adjudicated the question of whether Darling's damages claim is limited to a 270-day loss of BOC benefits.  Further, any such argument would not be persuasive.  Although throughout this proceeding—including in *Ford I*—Darling's has argued that it is entitled to recover damages based on Ford's denial of BOC benefits for more than 270 days, our

of damages are matters of law that we consider de novo. *See Woodworth v. Gaddis*, 2012 ME 138, ¶ 14, 58 A.3d 1109 (statutory interpretation); *Estate of Wilde*, 1998 ME 55, ¶ 7, 708 A.2d 273 (measure of damages).

[¶17] We address in turn the parties' arguments concerning (A) the damages period, which includes Ford's argument that it is entitled to argue good cause to eliminate or limit an award of damages, and (B) the reduction in damages awarded to Darling's based on substitute payments under the ASC program.

A.    Damages Period Pursuant to Section 1174(3)(B)

[¶18] Because the parties' dispute about the scope of damages rests on the interpretation of section 1174(3)(B), we first review the statute in light of the parties' arguments, and we then analyze the meaning of the Legislature's words as they apply here.

---

discussion of damages in *Ford I* was limited to the question of whether, when a manufacturer violates section 1174(3)(B), the Board has jurisdiction to determine a dealer's damages. We concluded that it does not, and we therefore remanded the case to allow a jury to assess damages. *Ford I*, 2014 ME 7, ¶¶ 46, 48, 86 A.3d 35. Consequently, *Ford I* did not present an occasion for us to address the merits of any argument relating to the actual calculation of damages, and we did not reach that issue.

1.     Statutory Framework and Arguments on Appeal

[¶19]  Title 10 M.R.S. § 1173 creates a private cause of action for dealers seeking damages when a manufacturer engages in certain unfair and deceptive trade practices.  Specifically, the statute provides that

> [a]ny franchisee or motor vehicle dealer who suffers financial loss of money or property, real or personal, or who has been otherwise adversely affected as a result of the use or employment by a franchisor of an unfair method of competition or an unfair or deceptive act or any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief.

10 M.R.S. § 1173.

[¶20]  The acts constituting "unfair methods of competition" and "unfair and deceptive practices," which give rise to a section 1173 claim for damages, are defined in section 1174.  The pertinent aspect of that statute, which is found in section 1174(3)(B), establishes that a manufacturer engages in an "unfair method[] of competition" and an "unfair and deceptive practice[]" when the manufacturer

> threaten[s] or attempt[s] to modify a franchise during the term of the franchise or upon its renewal, if the modification substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment, without giving 90 days' written notice by certified mail of the proposed modification to the motor vehicle dealer, unless the modification is required by law or board order.

The statute further provides that "[w]ithin the 90-day notice period, the motor vehicle dealer may file with the board and serve notice upon the manufacturer a protest requesting a determination of whether there is good cause for permitting the proposed modification." 10 M.R.S. § 1174(3)(B). If a protest is filed, "[t]he board shall promptly schedule a hearing and decide the matter within 180 days." *Id.* At the hearing, "[t]he manufacturer has the burden of proving good cause," and "[t]he proposed modification may not take effect pending the determination of the matter." *Id.*

[¶21] As we held in *Ford I*, when Ford discontinued the BOC payments, it was required to provide Darling's with notice of that development but failed to do so in a statutorily sufficient way. 2014 ME 7, ¶¶ 27, 31, 86 A.3d 35. All of the parties now engage in an analysis that equates Ford's violation of section 1174(3)(B) with a claim for breach of contract, so that section 1173 would allow Darling's to recover the contract-based payments it would have received had Ford complied with the statute. *See infra* n.6. The point of contention centers on how long damages resulting from Ford's statutory violation continue to accrue.

[¶22] Darling's and MADA argue that when a manufacturer violates section 1174(3)(B), the statute unambiguously allows a dealer to recover

damages for a period in excess of the 270 days allowed for a dealer's protest and the issuance of the Board's decision. Further, they contend that pursuant to the statute's plain terms, Ford's proposed modification of the parties' franchise cannot take effect unless Ford satisfies the notice provision. Darling's and MADA argue that because Ford has not done so, Ford's obligation to make BOC payments continues and that Darling's is entitled to damages for payments that Ford did not make from April 1, 2005, to the present.

[¶23] For its part, Ford argues that section 1174(3)(B) does not specify how long damages continue to accrue and that, based on common law contract principles, Darling's damages should be limited to the 270-day notice-and-decision period. Alternatively, Ford argues that if Darling's is entitled to recover damages for more than 270 days, Ford must be allowed to present evidence that it had good cause to modify the franchise, which, if proved, would foreclose any recovery beyond the time allowed for a protest and administrative decision.

2. Statutory Analysis

[¶24] "Our main objective in construing statutes is to discern and give effect to the Legislature's intent." *Acadia Motors, Inc. v. Ford Motor Co.*,

2002 ME 102, ¶ 10, 799 A.2d 1228. To determine that intent, we first look to the "statute's plain meaning and the entire statutory scheme of which the provision at issue forms a part." *Samsara Mem'l Trust v. Kelly, Remmel & Zimmerman*, 2014 ME 107, ¶ 42, 102 A.3d 757. We construe a statute's plain language "by taking into account the subject matter and purposes of the statute, and the consequences of a particular interpretation." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 21, 107 A.3d 621. Accordingly, we reject interpretations that are "inimical to the public interest" or that produce absurd or illogical results. *Id.* (quotation marks omitted). Further, "[a]ll words in a statute are to be given meaning, and no words are to be treated as surplusage if they can be reasonably construed." *Hickson v. Vescom Corp.*, 2014 ME 27, ¶ 15, 87 A.3d 704 (quotation marks omitted). Only if the meaning of a statute is ambiguous do we consider extrinsic information such as legislative history. *See MaineToday Media, Inc. v. State*, 2013 ME 100, ¶ 6, 82 A.3d 104.

[¶25] We conclude that when a manufacturer unilaterally modifies a franchise in violation of section 1174(3)(B), the Dealers Act does not create

any temporal limitations on damages to which a dealer is entitled pursuant to section 1173.[6]

[¶26] As we explained in *Ford I*, 2014 ME 7, ¶¶ 28-31, 86 A.3d 35, section 1174(3)(B) prohibits manufacturers from "threatening or attempting to modify a franchise . . . [in a manner that] substantially and adversely affects [a] . . . dealer's rights, obligations, investment or return on investment," unless the manufacturer provides the dealer with ninety days' written notice of the modification by certified mail. 10 M.R.S. § 1174(3)(B). If a manufacturer complies with the statute, its proposed modification is automatically stayed during the ninety-day notice period. *See id.* Further, if during that period a dealer then invokes its right to administrative oversight by filing a protest with the Board, the stay continues during the pendency of the protest

---

[6] Our inquiry here focuses only on damages arising from a manufacturer's unlawful unilateral modification of a franchise in violation of section 1174(3)(B). We do not address the temporal scope or proper measure of damages arising from other types of "unfair methods of competition" and "unfair and deceptive practices" defined in section 1174.

We further note that throughout these proceedings, the distinction between Darling's claim for statutory damages and its potential claim for contract-based damages has been blurred. This began with Darling's request in its 2006 complaint for an award of damages equal to the amount of what it characterized as lost contract-based payments under the BOC program because of Ford's alleged failure to comply with section 1174(3)(B). And, in particular, on this appeal the parties do not distinguish between statutory and contract damages but rather treat them as coextensive. Consequently, in this case we do not address the application of the Dealers Act to a claim for statutory damages pursuant to section 1173 that the parties do not view as fully overlapping with a claim for breach of contract.

proceedings, which the Board must complete "within 180 days from the date the protest is filed." *Id.*

[¶27]  Given this statutory process, had Ford complied with the notice provision and had Darling's filed a protest that proved to be unsuccessful, Ford would have had to continue making BOC payments to Darling's for no more than 270 days.  Here, however, Ford *did not comply* with the statutory requirements and, by failing to comply with the statute, it has allowed the BOC program to remain unmodified throughout the course of this litigation. Despite its noncompliance, under Ford's interpretation of section 1174(3)(B), the extent of its liability to Darling's would be no more than *if it had complied with the law*.  Ford's reading thus significantly diminishes the incentive for manufacturers to comply with section 1174(3)(B): as Ford construes the statute, the only possible consequence for unlawful and deceptive conduct— beyond the payment of any benefits to which a dealer would be entitled even if the manufacturer provided sufficient notice—would be a civil penalty of $1,000 to $10,000, *see* 10 M.R.S. § 1171-B(3), which is payable to the State and not to the dealership that was actually harmed.  This is an absurd or illogical result that we seek to avoid when examining a statute's plain meaning.  *Cf. State v. Brown*, 2014 ME 79, ¶ 30, 95 A.3d 82 (refusing to construe a civil

penalty provision in a way that would allow a seller to repeatedly violate a statute without consequence, because such a result would be illogical).

[¶28] In addition to being illogical, Ford's interpretation renders superfluous the statutory language that provides dealers with the opportunity to file a protest and request a good cause determination from the Board. Under Ford's reading, a dealer's protest and the Board's good cause determination would be meaningless, because even if the Board found that a manufacturer lacked good cause, the manufacturer could ignore that determination and unilaterally modify the franchise—in other words, persisting in unfair and deceptive conduct that violates the Dealers Act, leaving the dealer without any additional recourse.[7] This would not only

---

[7] In support of its argument that a manufacturer may unilaterally modify a franchise regardless of the outcome of the administrative process, Ford relies on our statement in *Ford I* that "Ford's 'violation' was its use of an unfair or deceptive practice (i.e., substantially and adversely modifying the franchise without providing the required notice), not its failure to make each of its contractual payments." 2014 ME 7, ¶ 50, 86 A.3d 35. That language, however, merely framed our conclusion that the Board's imposition of a single civil penalty against Ford was not improper, *see id.*, and does not support the argument that Darling's damages should always be limited to 270 days, *see Forsythe v. Sun Life Fin., Inc.*, 475 F. Supp. 2d 122, 124-25 (D. Mass. 2007) (concluding that a one-time statutory violation resulted in "ongoing damages" accruing through the time of trial and judgment); *Waterville Indus. v. Fin. Auth. of Me.*, 2000 ME 138, ¶ 23, 758 A.2d 986 (stating that a one-time breach of contract may result in continuing damages).

Additionally, contrary to Ford's contention, we did not decide in *Ford I* that manufacturers may unilaterally modify franchise relationships at any time notwithstanding a failure to comply with section 1174(3)(B). Although we stated that pursuant to the parties' service and sales agreement "Ford could unilaterally issue new terms and conditions," we ultimately held that its right to do so was circumscribed by the procedural requirement of proper notice as established in section 1174(3)(B). *Ford I*, 2014 ME 7, ¶¶ 26-27, 86 A.3d 35. Moreover, as discussed above, *see supra* n.5, we did not address the measure of damages flowing from such a violation.

prejudice dealers by depriving them of a meaningful opportunity to challenge proposed franchise modifications, but it would also functionally substitute the manufacturer for the Board as the ultimate decision-maker on whether "good cause" exists. We decline to construe section 1174(3)(B) in a way that renders significant portions of it meaningless.

[¶29] Ford also points to the statutes of some other states, which, unlike Maine's Dealers Act, expressly provide that when a dealer files a protest contesting a proposed franchise modification, the modification is ineffective absent a finding of good cause. *See, e.g.*, Cal. Veh. Code § 3060(b)(1) (Deering, LEXIS through ch. 893 of the 2016 Reg. Sess. & ch. 8 of the 2015-16 2nd Extraordinary Sess.) (providing that "the modification or replacement does not become effective *until there is a finding by the board that there is good cause* for the modification or replacement" (emphasis added)); 815 Ill. Comp. Stat. Ann. 710/4 (d)(6)(E) (LEXIS through P.A. 99-904 of the 2016 Reg. Legis. Sess.) (prohibiting a manufacturer from modifying a franchise "before the hearing process is concluded . . . and thereafter, *if the Board determines that the manufacturer has failed to meet its burden of proof and that good cause does not exist to allow the proposed action*" (emphasis added)). Ford argues that because section 1174(3)(B) provides only that

"[t]he proposed modification may not take effect *pending the determination of the [protest]*," 10 M.R.S. § 1174(3)(B) (emphasis added), a manufacturer's unilateral franchise modification becomes effective under Maine's Dealers Act even without good cause.

[¶30]  This argument is not persuasive for two reasons.  First, 10 M.R.S. § 1182 provides that "[a]ny contract or part thereof *or practice thereunder* in violation of any provision of [the Dealers Act] shall be deemed against public policy and shall be *void and unenforceable*."  (Emphases added.)  A proposed franchise modification is therefore ineffective absent full compliance with section 1174(3)(B).

[¶31]  Second, the Dealers Act was enacted to address the "disparity in bargaining power between automobile manufacturers and their dealers . . . [by] protect[ing] dealers from actions by manufacturers that were perceived as abusive and oppressive."  *Acadia Motors v. Ford Motor Co.*, 844 F. Supp. 819, 827-28 (D. Me. 1994), *rev'd on other grounds by* 44 F.3d 1050 (1st Cir. 1995).  If a manufacturer were authorized to unilaterally modify the franchise even when it failed to comply with the statutory process or did not demonstrate good cause for the modification after a dealer filed a protest, the manufacturer's action would reinstate the economic imbalance that the

Dealers Act is intended to eliminate. *Cf. E. of Me., Inc. v. Vintners Grp., Ltd.*, 455 A.2d 936, 944 (Me. 1983) (holding that strict compliance with the procedural provisions in a similarly structured statute was necessary to effectuate the Legislature's intent of reducing the disparity in bargaining power between wholesalers and suppliers). Therefore, when read in light of the Dealers Act's overall "subject matter and purpose[]," *Dickau*, 2014 ME 158, ¶ 21, 107 A.3d 621, section 1174(3)(B) makes contested franchise modifications contingent on a Board finding of good cause.

[¶32] In sum, to avoid a result that is illogical and "inimical to the public interest," *id.* (quotation marks omitted), we conclude that pursuant to section 1174(3)(B), a proposed franchise modification is ineffective unless the manufacturer provides proper notice to the dealer, and either (1) the dealer does not file a protest with the Board within ninety days, or (2) the dealer files a protest and the Board determines that good cause exists for the modification.[8] Because neither of these exceptions is present here, the

---

[8] Ford contends that when the statute is construed in this way, a Board finding of no good cause is tantamount to a permanent injunction against a franchise modification, and that the Board does not have the authority to award such equitable relief. *See* 10 M.R.S. § 1188 (listing the Board's duties); *cf. Ford I,* 2014 ME 7, ¶¶ 43-46, 86 A.3d 35 (holding that pursuant to sections 1173(1), 1188, and 1189-B, the courts, and not the Board, have the authority to award damages). This argument is not persuasive. As is noted above, *see supra* ¶ 29, Ford itself relies on analogous statutes from other jurisdictions that result in an ongoing administrative injunction against the implementation of a franchise modification when a board determines that the modification is not supported by good cause.

franchise modification has not yet been implemented, and Ford's obligation to pay Darling's the incentive prescribed by the BOC program remains in place. The trial court therefore erred by limiting the damages period to the 270 days following the termination of BOC payments on April 1, 2005.

3.      Evidence of Good Cause

[¶33]   Having concluded that section 1174(3)(B) does not create temporal limitations on Darling's damages claim, we consider Ford's contingent argument that on remand it should be entitled to present evidence of the circumstances that would have existed but for its statutory violation, in order to prevent Darling's from receiving a windfall.  Specifically, Ford argues that it is entitled to present evidence that had it provided Darling's with statutorily proper notice of the proposed franchise modification, and that had Darling's filed a protest, the Board would have determined that Ford had good cause to implement the modification, thereby limiting Darling's damages to no more than 270 days.  For two reasons, Ford's argument is not persuasive.

[¶34]   First, Ford has always had the power to stop damages from accruing further by simply complying with the notice requirement of the statute, rather than by making what it described to the court as a business decision not to do so.  Because Ford has chosen not to satisfy the statutory

prerequisite necessary to trigger the "good cause" determination, it is not entitled to present evidence of good cause at a trial on damages in order to limit or even preclude recovery by Darling's.

[¶35]  Second, section 1174(3)(B) vests authority in the Board—and not the courts—to make the good cause determination.  The Board's members are appointed by the Governor and the Secretary of State, 10 M.R.S. § 1187(1), and must possess "expertise in the specialized area of motor vehicle franchise relationships," which enables them to "promptly resolve complex and time-consuming litigation," *Ford I*, 2014 ME 7, ¶ 39, 86 A.3d 35 (quotation marks omitted).  Additionally, section 1187(1) specifies that four of the seven Board members must have experience as franchisees or franchisors, and another member must be "an attorney employed by the Secretary of State and assigned to the Bureau of Motor Vehicles."  Because of the professional background and expertise inherent in the Board membership, and the Legislature's decision to vest in that body exclusive authority to make good cause determinations, a citizen jury could not be expected to make the specialized determination of "good cause" on a de novo basis.

[¶36]  A citizen jury also could not be expected to determine whether *the Board* would have decided that good cause existed in the context of a

hypothetical administrative proceeding that never occurred. When a manufacturer complies with the Dealers Act and provides proper notice of a proposed franchise modification to a dealer, which then files a protest, the Board becomes responsible for making a "good cause" determination, *see* 10 M.R.S. § 1174(3)(B), and any recourse available in the court is in an appeal of the Board's decision, *see id.* § 1189-B. Thus, Ford's argument that "good cause" can be litigated *in court* as an element of a trial on damages functionally converts an appellate issue into an issue of initial determination.[9]

[¶37] We cannot conclude that the Legislature intended such an attenuated and unwieldy proceeding that ventures into a hypothetical world, because a judicial proceeding to determine that issue simply cannot replicate the intended process where a panel of experts is charged with resolving a commercial dispute. *Cf. Immigration & Naturalization Serv. v. Ventura*, 537 U.S. 12, 16 (2002) (stating that a court must not "intrude upon the

---

[9] As we recognized in *Ford I*, in proceedings governed by the Dealers Act the court's jurisdiction can be either appellate or original. 2014 ME 7, ¶¶ 19-22, 86 A.3d 35. When a complaint is filed with the court, however, the judicial proceeding is stayed pending any related proceeding that is filed with the Board within sixty days after the court action is commenced; and if a party files a complaint with the Board in the first instance, that party is barred from filing a related action in court while the administrative action is pending. *Id.* ¶ 21 (discussing the interaction between the court and the Board pursuant to sections 1190 and 1190-A). This means that even when a dealer seeks judicial rather than administrative recourse, the administrative process—which includes the Board's determination of whether a manufacturer has demonstrated "good cause" to justify a franchise modification—is allowed to play out before the case is subject to final adjudication in the courts.

domain which [the Legislature] has exclusively entrusted to an administrative agency" (quotation marks omitted)). Accordingly, we conclude that Ford is not entitled to raise a "good cause" defense to avoid or limit its damages to Darling's.

B.    Substitute Transaction

[¶38] Darling's and MADA next contend that the court committed legal error when it reduced the damages awarded to Darling's by the amounts it received from Ford under the ASC program, based on the jury's finding that those payments were a "substitute" or "replacement" for the BOC payments. Darling's and MADA do not challenge the jury's factual finding that the ASC program was a substitute for the BOC program. Rather, they challenge the court's legal conclusion that the substitute payments should be included in the calculation of net damages.[10]

[¶39] The Legislature did not specify how damages recoverable pursuant to 10 M.R.S. § 1173 should be calculated. Because the parties have

---

[10] As an initial matter, Darling's argues that pursuant to section 1174(3)(B), the issue of offsets or substitute payments is only relevant in the context of a good cause proceeding before the Board, and does not bear on the issue of damages. Although it is true that the Board may consider whether a "proposed modification is offset by other modifications beneficial" to the dealer in making a good cause determination, 10 M.R.S. § 1174(3)(B)(6), this does not preclude a court from also including offsets in its damages calculation especially when, as here, the statute does not specify how damages accruing within a particular timeframe should be calculated.

argued their positions in terms of contract principles, we examine the issue on that basis. *See supra* n.6.

[¶40] Damages for a breach of contract are generally "based on the injured party's expectation interest, defined as its interest in having the benefit of its bargain by being put in as good a position as it would have been in had the contract been performed." *Deering Ice Cream Corp. v. Colombo, Inc.*, 598 A.2d 454, 456-57 (Me. 1991) (alterations omitted) (quotation marks omitted). This general measure of damages is subject to a number of limitations, including the principle that "[t]he damages awarded [to] the injured party should reflect . . . any net benefit that the injured party could reasonably realize as a result of the termination of the contract." *Id.* This offset to damages includes the benefits received by an injured party from the party in breach, when those benefits are offered as a substitute for those that the injured party should have received under the contract and the offer is not "conditioned on surrender by the injured party of his claim for breach." Restatement (Second) of Contracts § 350 cmt. e, illus. 14 (Am. Law Inst. 1981). And in fact, to mitigate damages, "the injured party is expected to make appropriate efforts to avoid loss by arranging a substitute transaction." *Id.* cmt. c. "Whether an available alternative transaction is a suitable substitute

26

depends on all the circumstances, including the similarity of the performance and the times and places that they would be rendered." *Id.* cmt. e.

[¶41] Here, the court instructed the jury to determine whether "the Accelerated Sales Challenge [was] a substitute or replacement for the Blue Oval Payments." The court's instructions to the jury correctly stated the basic contract law principles described above and included the factors relevant to determining whether the ASC benefits were a suitable substitute for the BOC benefits. Because the jury returned a verdict finding that the ASC program was a substitute transaction, the court properly reduced Darling's gross damages by the amounts it received under the ASC program.

[¶42] Darling's and MADA argue that because a "proposed modification may not take effect" during the 270-day administrative notice-and-decision period, 10 M.R.S. § 1174(3)(B), Darling's was entitled to recover the full value of BOC payments due during that period. They assert that if Ford had complied with the statute, it would have been required to continue making BOC payments during that timeframe *in addition* to payments due under any new sales incentive programs. Contrary to their contentions, however, the rule regarding substitute transactions applies when a breach has already occurred and provides that the substitute transaction *replaces* the benefit lost

as a result of the breach. Because the jury here found that the ASC program *replaced* the discontinued BOC payments, Darling's was not entitled to payments due under both programs.

[¶43] The court therefore did not err by reducing Darling's damages based on the jury's finding that the ASC program constituted a substitute transaction.

## III. CONCLUSION

[¶44] We conclude that pursuant to the plain meaning of 10 M.R.S. § 1174(3)(B), a proposed modification of a franchise remains ineffective unless and until a manufacturer provides a dealer with written notice of the modification in conformity with the statute, which is necessary to trigger the dealer's opportunity to request a good cause determination by the Board. Because Ford has declined to satisfy the notice requirement, Darling's damages have continued to accrue from April 1, 2005, when Ford terminated the BOC payments, until the present. We therefore conclude that the court erred as a matter of law by limiting Darling's recovery to 270 days of unpaid benefits, and we must remand for a new trial on damages. We further conclude, however, that the court did not commit legal error by reducing Darling's damages by the amounts it received under the ASC program because

the jury found that those payments were a suitable substitute for the BOC payments. On remand, Ford is entitled to an offset of any damages awarded to Darling's based on payments that Darling's received pursuant to the ASC program.

The entry is:

> Judgment affirmed in part and vacated in part. Remanded to the Business and Consumer Docket for a new jury trial on the issue of damages.

---

**On the briefs:**

Judy A.S. Metcalf, Esq., and Noreen A. Patient, Esq., Eaton Peabody, Brunswick, for appellant Darling's

Michael Kaplan, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Portland, for appellant Maine Automobile Dealers Association

Daniel L. Rosenthal, Esq., and Lee H. Bals, Esq., Marcus, Clegg & Mistretta, P.A., Portland, for cross-appellant Ford Motor Company

**At oral argument:**

Judy A.S. Metcalf, Esq., for appellant Darling's

Michael Kaplan, Esq., for appellant Maine Automobile Dealers Association

Jessica Ellsworth, Esq., Hogan Lovells, Washington, D.C., for cross-appellant Ford Motor Company