STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
PORSC-CV-22-202

RAYMOND UTTARO and
PAULA UTTARO,

        Plaintiffs,

v.

JEROME CLEVELAND JR.,

        Defendant

**ORDER ON MOTION FOR
ATTACHMENT AND TRUSTEE
PROCESS**

Before the court is Plaintiffs' Motion for Attachment and Attachment on Trustee Process. The motion has been fully briefed. For the following reasons, the court grants the motion and allows an attachment in the amount of $424,414.

**Background**

The following facts are drawn from Plaintiffs' filings, including the complaint, motion, reply, and attachments thereto:

Plaintiffs Raymond and Paula Uttaro contracted with Defendant Jerome Cleveland Jr. to construct a home at their property in Naples, Maine for a fixed price of $771,000. The contract referred to a set of plans for construction. In relevant part, the contract required a $200,000 down payment, which Plaintiffs paid; invoices to be issued every two to three weeks with payment upon receipt; and written change orders to be executed before work that would result in a change of price was performed. Substantial completion was estimated at November 2021.

Defendant began work building the home on July 7, 2021 but did not send Plaintiffs an invoice until November 2021, when he sent at least two invoices. The first invoice ("Invoice

1

Entered on the Docket: 11 / 3 o/ 2022

REC'D CUMB CLERKS OFC
NOV 30 '22 AM 11:00

510") was for $179,720.83 of work encompassed by the contract and plans. The second ("Invoice 512") was for $30,906 of work purported to be outside of the scope of the contract and plans. The work purporting to be outside the scope of the contract was extra hauling, a rented jackhammer, changing the driveway from tar to concrete, and reducing the height of walls. Plaintiffs claim that the first two extra charges were necessary to complete the house as agreed within the scope of the contract by ensuring that the driveway was a usable height and that the first level would not be largely underground. Raymond Uttaro requested the third change but was not informed of the amount of the price increase. Plaintiffs admit Raymond Uttaro agreed to the fourth change but claim that change only accounts for $1,232 of the $30,906 on Invoice 512.

Upon receiving Invoice 512, Plaintiffs objected to the extra charges. Defendant stopped work on the building and refused to continue before receiving another $150,000 payment for materials and subcontractor work. Plaintiffs paid Defendant but conditioned the payment on the funds' being applied to the $30,906 in extra charges and receipt of documentation of the costs incurred so far. Work progressed slowly from November 2021. A basic roof was installed on February 25, 2022. Defendant then stopped work on the project without having completed the site work, the septic and well, the windows and doors, the siding, and the roof, and without having begun interior work. Plaintiffs have entered into a contract to complete the house for the amount of $946,320. After subtracting $70,000 in improvements over the project contemplated by the Cleveland contract, the Plaintiffs contends the cost to complete Defendant's project obligations was $876,320.

In his opposition, Defendant states the following facts:

Plaintiffs continually bypassed Defendant to change the building plans, scope of work, and materials required. Changes by Plaintiffs account for all of the extra charges on Invoice 512.

2

Plaintiffs continually altered the scope of the project by speaking directly to subcontractors, then refused to pay for the additional work they requested from subcontractors. Defendant delivered Plaintiffs a letter on February 10, 2022 indicating that he would stop work on the project due to Plaintiffs' continuing direct communications with subcontractors, false statements regarding Defendant's business, changes to work and materials, and refusal to pay for additional work outside of the initial contract. In March 2022, after termination, Defendant attempted to send Plaintiffs an accounting of expenses any payments to date, but it was returned to sender.

Plaintiffs' complaint consists of seven counts: (I) breach of contract, (II) quantum meruit, (III) unjust enrichment, (IV) violation of the Home Construction Contract Act ("HCCA") and the Unfair Trade Practices Act ("UTPA"), (V) negligent misrepresentation, (VI) intentional misrepresentation, and (VII) negligence. Defendant counterclaims with four counts against Plaintiffs: (I) and (II) defamation, (III) unjust enrichment, and (IV) quantum meruit. Plaintiffs' motion for attachment is based on Plaintiffs' Count I for breach of contract.

**Legal Standard**

Maine Rules of Civil Procedure 4A and 4B govern attachment and trustee process. "[R]eal estate, goods and chattels and other property may ... be attached and held to satisfy the judgment for damages and costs which the plaintiff may recover." M.R. Civ. P. 4A(a). With some exceptions trustee process may be used to secure satisfaction of a judgment for damages and costs. M.R. Civ. P. 4B(a). Trustee process may be served only if attachment on trustee process has been approved for a specified amount by order of the court. M.R. Civ. P. 4B(c).

An order of attachment may only be issued "upon a finding by the court that it is more likely than not that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance, bond, or

3

other security,[1] and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment." M.R. Civ. P. 4A(c). The court bases its determination on "the merits of the complaint and the weight and credibility of the supporting affidavits." *Porrazzo v. Karofsky*, 1998 ME 182, ¶ 7, 714 A.2d 826. Affiants must "set forth specific facts sufficient to warrant the required findings." M.R. Civ. P. 4A(i). "Because prejudgment attachment may operate harshly upon the party against whom it is sought, there must be strict compliance with the procedures prescribed by legislation and implemented by court rules." *Wilson v. DelPapa*, 634 A.2d 1252, 1254 (Me. 1993) (citations omitted).

**Discussion**

The court's analysis of whether attachment should be granted is based on the Plaintiffs' complaint and the affidavits provided by the parties. Plaintiffs have provided five affidavits: one each from Raymond Uttaro and Phil LaClaire filed on June 9, 2022, and one each from Raymond Uttaro, Phil LaClaire, and Attorney Theodore Small filed on September 6, 2022. Defendant submitted an affidavit of Jerome Cleveland on August 12, 2022. Each affidavit was filed with exhibits attached. After considering these materials, the court finds that Plaintiffs are more likely than not to succeed on their claim for breach of contract and that they are entitled to an attachment.

Plaintiffs argue that Defendant breached the construction contract by not submitting invoices every two to three weeks, charging extra for costs within the scope of the project, failing to inform Plaintiffs of price increases associated with work performed, failing to complete the project without justification, and demanding payment inconsistent with contract terms. Defendant responds that he adequately charged and refunded Plaintiffs, that Plaintiffs were in

---

[1] The court notes that neither party has made a showing regarding available insurance. Therefore, the court does not address it as a factor.

material breach of the contract by requesting changes directly from the subcontractors, and that Plaintiffs' breach justified his cessation of work.

The court first considers whether Defendant breached the contract by ceasing work on the project. A plaintiff asserting a breach of contract action must demonstrate breach of a material term, causation, and damages. *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248. The parties agree that Defendant did not finish the project. Unless Defendant's cessation of work was justified, failing to perform his duties under the contract was breach because finishing construction is a material term of the contract and failure to do so caused Defendants to seek out a new contract to finish the work. Defendant argues that he was justified in quitting the project because of Plaintiffs' material breach of contract. Defendant claims Plaintiffs engaged in behavior "including (a) continued direct communications with suppliers and subcontractors, (b) false statements regarding Cleveland's business practices, (c) constant changes to the work and materials, and (d) refusal to pay Cleveland for additional work outside the initial Contract."[2] Opposition at 3-4. On the contrary, the record suggests that Plaintiffs are more likely than not to prevail on this claim.

A material breach occurs when a party fails to perform a duty that is "so material and important as to justify the injured party in regarding the whole transaction as at an end." *Down E. Energy Corp. v. RMR. Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417. In the case of a material breach, the nonbreaching party may cease performance. *Id.* On the other hand, if a breach is only partial, the nonbreaching party must still perform its obligations under the contract so that it does not breach the contract itself. *Id.* Whether a breach is material is a factual determination. *Jenkins,*

---

[2] Part of Defendant's argument is that damages likely to be awarded for his counterclaim would offset the requested attachment. However, for purposes of a motion for attachment, the court is obliged to disregard an opposing claim. *Casco Northern Bank v. New England Sales Inc.*, 573 A.2d 795, 797 (Me. 1990); *New Eng. Inspection v. Casco Bay Steel Structures*, 2020 Me. Super. LEXIS 94, *3 (Sept. 11, 2020).

*Inc. v. Walsh Bros.*, 2001 ME 98, ¶ 13, 776 A.2d 1229. The Law Court has approvingly cited the Restatement (Second) of Contracts § 241, which lists five factors to consider in determining whether a breach is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;
> (c) the extent to which the party failing to perform . . . will suffer forfeiture;
> (d) the likelihood that the party failing to perform . . . will cure his failure . . .;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Assoc. Builders, Inc. v. Coggins*, 1992 ME 12, ¶ 6 n.1, 722 A.2d 1278 (quoting Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)). In *Associated Builders v. Coggins*, the Law Court found that material breach did not occur where a late payment was not made in bad faith and did not prejudice the contracting payee.

In this case, the only conduct Defendant alleges Plaintiffs engaged in that the court believes might rise to the level of material breach is refusing to pay Defendant for extra work performed after requesting it. The record before the court shows that the parties agree that Plaintiffs did pay Defendant for the extra charges on Invoice 512 and then Defendant continued work on the project.

Defendant in his affidavit claims that Plaintiffs thereafter continued to change the plans directly with the subcontractors including by changing the location of and adding windows, upgrading the showers, changing the style of the garage door, and seeking cost information about skylights. Except for a few conclusory statements in his affidavit, Defendant has not presented evidence that Plaintiffs unilaterally directed the subcontractors to make these changes. There is no record that Cleveland directed the Plaintiffs to stop interfering with the contractors. There is no record that the owners' directions to the subcontractors resulted in any changes that increased

6

the cost of the project. There is no evidence Cleveland presented the Plaintiffs with change orders identifying increased costs as a result of the changes. Finally, Raymond Uttaro's September 6 Affidavit denies making continual changes directly with subcontractors and explains some incidents he believes Defendant mischaracterizes. Based on the affidavits, it does not appear likely that Plaintiffs were in material breach of the contract in the manner Defendant describes. Therefore, it is more likely than not, based on this record, that Defendant's cessation of work on the home would have constituted breach of the contract, resulting in the costs Plaintiffs incurred to find another contractor and finish construction.

The court now turns to the issue of damages. The Law Court has cited the Restatement (Second) of Contracts on issues of damages in actions for breach. *E.g., Ford Motor Co. v. Darling's*, 2016 ME 171, ¶ 40, 151 A.3d 507; *Marchesseault v. Jackson*, 611 A.2d 95, 98 (Me. 1992); *Deering Ice Cream Corp. v. Colombo, Inc.*, 598 A.2d 454, 457 (Me. 1991); *Anuszewski v. Jurevic*, 566 A.2d 742, 743 (Me. 1989). An injured party has a right to damages based on his expectation interest, as measured by his loss in value of the other parties' performance caused by the breach plus any other loss caused by the breach, minus any cost he has avoided by not having to perform. Restatement (Second) of Contracts § 347. Comment e, Illustration 12 to § 347 of the Restatement (Second) of Contracts is instructive:

> A contracts to build a house for **B** for $100,000, but repudiates the contract after doing part of the work and having been paid $40,000. Other builders would charge **B** $80,000 to finish the house, but **B** finds a builder in need of work who does it for $70,000. **B**'s damages are limited to the $70,000 that he actually had to pay to finish the work less the $60,000 cost avoided or $10,000, together with damages for any loss caused by the delay.

Another way to complete the same calculation is: Amount Paid, plus Amount of New Contract, minus Amount of the Original Contract. (In this illustration, $40,000 plus $70,000, minus $100,000 equals $10,000.)

7

In this case, the Cleveland contract was for $771,000. There is an additional claim for $30,906 in changes. While the Plaintiffs dispute those charges, the court cannot find it is more likely than not they were not legitimate. Therefore, the price to build the house that the parties contracted was $801,906. The Plaintiffs have paid $350,000. The cost to complete the house that Cleveland promised to build was $876,320. The court does not find sufficient evidence to include the extra funds the Plaintiffs claim they will spend on excavation in the order for attachment. Therefore, by the time their house is built, the Plaintiffs will have spent $1,226,320 ($876,320 plus $350,000) for a house that Cleveland agreed to build for $801,906. The difference is $424,414.[3]

**Conclusion**

On this record, the court finds that it is more likely than not that Plaintiffs will be entitled to recover $424,414 from Defendant. Therefore, the court grants the motion for attachment in that amount.

If necessary, the Plaintiffs may submit an abstract of this order in a recordable format.

The entry is:

Plaintiffs' Motion for Attachment and Attachment on Trustee Process is

GRANTED.

The court grants an attachment and attachment by trustee process in the amount of $424,414 against the property and assets of Jerome Cleveland Jr., provided, however, that the first $100 of demand bank accounts held by any one trustee shall be exempt from Trustee Process issued pursuant to this Order.

---

[3] The parties spent some time trying to establish the value of the work completed. Regardless of that value, the only evidence before the court is that the Plaintiffs have to spend $876,320 to complete the house.

8

The clerk may incorporate this Order on the docket by reference. M.R. Civ. P. 79(a).

DATE: 11/30/2022

Thomas R. McKeon
Justice, Maine Superior Court