STATE OF MAINE                                    BUSINESS & CONSUMER COURT
CUMBERLAND, ss.                                   DOCKET NO. BCD-AP-2008-00001
                                                                BCD-AP-2008-00002
                                                                BCD-AP-2010-00005


FORD MOTOR COMPANY

                  Petitioner,                )
                                             )
          v.                                 )
                                             )
                                             )    ORDER ON PARTIES' CROSS MOTIONS
DARLING'S, et al.                            )    FOR SUMMARY JUDGMENT
                  Respondents.               )
                                             )
                                             )
                                             )
                                             )
                                             )


       This case has been actively litigated since 2008. If the case doesn't hold the record for the

oldest, continuously litigated civil matter in Maine, it must be near the top of the list. As a result

of the lengthy litigation many facts have been established, liability has been established, and the

only issue left before the Court is damages. On December 17, 2021, Petitioner Ford Motor

Company ("Ford) filed a Motion for Summary Judgment pursuant to M.R. Civ. P. 56, and

Respondent Darling's ("Darling's) filed a Motion for Partial Summary Judgment (collectively the

"Cross Motions"). The Cross Motions raise three simple questions, which for the reasons set forth

below are answered as follows: (1) Darling's Blue Oval Certification program ("BOC") damages

stopped accruing on March 18, 2019; (2) Darling's eligibility for damages has already been

established, and Darling's does not need to address eligibility as part of its damages case; and (3)

payments made pursuant to BOC replacement programs can be used to offset damages owned

under the BOC program. The Cross Motions are thus each granted in part and denied in part. The

case is now ready for what will be a second damages hearing. As corrected or clarified by the

answers described above, the second damages hearing will proceed exactly like the first damages

hearing, with the exception that Ford will be allowed to introduce evidence limited to the programs that replaced the BOC program as discussed below.

## STANDARD OF REVIEW

Summary judgment is appropriate where the parties' statements of material fact and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view a party's statements of material fact in the light most favorable to the non-movant and draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. However, a party may not "rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence . . . of a fact." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 3, 740 A.2d 560. A party who moves for summary judgment is entitled to judgment only if the party opposed to the motion, in response, fails to submit "enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774.

"As a central tenet of summary judgment motion practice, facts not set forth in the statement of material facts are not in the summary judgment record, even if the fact in question can be gleaned from affidavits or other documents attached to, and even referred to in portions of, a statement of material fact." *Berry v. Mainestream Fin.*, 2019 ME 27, ¶ 7, 202 A.3d 1195 (quoting

*HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 22, 28 A.3d 1158) (alteration and quotation marks omitted).

## FACTS

As discussed above, the only issue presently before this court is the issue of damages. Many of the underlying facts have been determined based on prior trial court and Law Court decisions, especially *Ford Motor Co. v. Darling's*, 2016 ME 171, 151 A.3d 507 *(Ford II)*.[1] The entire arc of the litigation need not be retraced. For the purpose of resolving the questions raised by the Cross Motions, and in the interest of brevity, the Court finds the following material facts are undisputed:

1. In December 2006, Darling's commenced this action by filing a twelve-count complaint with the Maine Motor Vehicle Franchise Board (the "Board"), alleging various violations by Ford of the Maine Motor Vehicle Franchise Act when it ended the 1.25% Blue Oval Certified cash incentive program (the "Dealers Act"). (Resp't's S.M.F. ¶ 1, citing *Ford I* at ¶ 7; Pet.'r's S.M.F. ¶ 33.)

2. On the first day of the hearing before the Board in 2007, the parties jointly stipulated that "(1) Darling's was certified as a BOC Dealer at the beginning of the program and had never lost that status . . . ." (Resp't's S.M.F. ¶ 5.)

3. The Board, a 2011 Business Court jury, and the *Ford I* Law Court all found in favor of Darling's that Ford's termination of the BOC payments to Darling's triggered the 90-day certified mail notice requirement. (Resp't's S.M.F. ¶ 6, citing *Ford I* at ¶¶ 7, 9-10, 27, 31).

---

[1] The Law Court decisions cited by the parties and this Court are *Ford Motor Co. v. Darling's*, 2016 ME 171, 151 A.3d 507 *(Ford II)* and *Ford Motor Co. v. Darling's*, 2014 ME 7, 86 A.3d 35 *(Ford I)*. The parties also referenced the prior trial court decisions *Ford Motor Co. v. Darling's*, No. BCDWB-AP-08-01, BCDWB-AP-08-02, BCDWB-AP-10-05, 2011 Me. Bus. & Consumer LEXIS 5 (March 17, 2011) and *Ford Motor Co. v. Darling's*, No. BCDWB-AP-08-01, BCDWB-AP-08-02, BCDWB-AP-10-05, 2014 Me. Super. LEXIS 270 (Aug. 28, 2014).

4. The *Ford I* Court remanded the matter back to this Court for a determination of Darling's damages because the Board was not authorized to award damages. (Resp't's S.M.F. ¶ 7, citing *Ford I* at ¶ 52.)

5. A two day jury trial on damages was held in September 2014. In a pretrial ruling, the Court erred by limiting damages to the 270-day period immediately following the discontinuation of the BOC payment on April 1, 2005. (Resp't's S.M.F. ¶¶ 12, 13, 21, citing *Ford II* at ¶¶ 13-15.)

6. At the September 2014 jury trial on damages, the parties stipulated to an amount Darling's would have earned under the BOC. (Resp't's S.M.F. ¶ 14.)

7. When stipulating to the damages, Ford did not raise the issue of whether Darling's remained eligible under the BOC during the 270-day period. (Resp't's S.M.F. 15.)

8. On appeal in 2016, Ford presented arguments on numerous issues it wished to litigate if the case was remanded, but Darling's eligibility to receive further payments under the BOC was not among the arguments raised by Ford. (Resp't's S.M.F. ¶ 22).

9. In *Ford I* and *Ford II*, the Law Court found Ford had not provided Darling's with an effective notice of the franchise modification. (Resp't's S.M.F. ¶ 23, quoting *Ford II* at ¶ 11.)

10. In *Ford II* the Law Court elucidated that due to Ford's failure to provide Darling's with an effective notice of the franchise modification, Darling's had not been given an opportunity to protest. (Resp't's S.M.F. ¶ 23, quoting *Ford II* at ¶ 11.)

11. The Law Court also explained in *Ford II* that a proposed franchise modification is ineffective until the manufacturer provides proper notice to the dealer, and "either (1) the dealer does not file a protest with the Board within 90 days, or (2) the dealer files a

protest and the Board determines that good cause exists for the modification." (Resp't's S.M.F. ¶ 24, quoting *Ford II* at ¶ 32.)

12. As a result of Ford's failure to provide the required notice and Darling's inability to protest, Ford's attempts to modify Darling's franchise was ineffective and its obligation to pay Darling under the BOC continued. (Resp't's S.M.F. ¶¶ 23-24, quoting *Ford II* at ¶¶ 11, 32.)

13. As required by law, Ford provided Darling's with the certified mail notice on December 19, 2016 to end payment under the BOC. (Resp't's S.M.F. ¶ 27; Pet'r's S.M.F. ¶¶ 3-4.)

14. Ford's December 19, 2016 notice stated '[i]n 2016, the [Law] Court held that Darling's damages from Ford's 2005 statutory violation continue to accrue until Ford provides you certified mail notice. Pursuant to 10 M.R.S. Sec. 1174(3)(B), Ford hereby provides notice that, effective 90 days from receipt of this notice, your eligibility to continue to receive the 1.25% cash incentive component of the [BOC] under the [Law] Court's decision will be terminated." (Resp't's S.M.F. ¶ 28; *see also* Pet'r's S.M.F. ¶ 3.)

15. In March 2017, Darling's filed a seven-count complaint with the Board in response to Ford's December 16, 2019 notice. Count I of the Complaint was Darling's statutory protest. (Resp't's S.M.F. ¶¶ 29-30.)

16. The parties agreed to litigate Darling's Count I statutory protest first, and to stay all other counts in the March 2017 complaint until Count I was decided. (Resp't's S.M.F. ¶ 31.)

17. Darling's, Ford, and the Maine Automobile Dealers Association ("MADA"), which was allowed to intervene, litigated Darling's statutory protest with evidence being

taken during a three-day Board hearing conducted December 3, 4, and 5, 2018. (Resp't's S.M.F ¶¶ 32-33.)

18. The Board found in favor of Ford and denied Darling's statutory protest in a written decision on March 18, 2019. (Resp't's S.M.F ¶ 34.)

19. The March 18, 2019 written decision was issued after the majority of the Board members found Ford had "good cause" to modify the Darling's franchise. (Pet'r's' S.M.F. ¶ 5; Pet'r's S.M.F. ¶ 34.)

20. After the litigation of Count I, Counts II, III, IV, V, and VI were dismissed with prejudice by Stipulation of Dismissal signed by the parties on or about April 2, 2019 and approved by the Board on April 12, 2019. (Resp't's S.M.F ¶ 35.)

21. Count VII involved Ford's breach of a confidential settlement agreement and was filed under seal. (Resp't's S.M.F. ¶30.) Count VII was resolved on June 4, 2020 when the Board granted Summary Judgment in favor of Darling's. The Board entered a written order on October 14, 2020 imposing civil penalties against Ford, which became final on November 13, 2020. (Resp't's S.M.F ¶¶ 36-39).

22. Ford did not move pursuant to M.R. Civ. P. 54(b) to make the decision on Count I a separate and final judgment from Count VII, so the Board action as a whole was not finalized until November 13, 2020. (Resp't's S.M.F ¶¶ 39-40, 43.)

23. While the Board action was pending, the present action was stayed seven times. (Resp't's S.M.F ¶¶ 41-42.)

24. On December 3, 2021 in its response to Darling's Second Set of Interrogatories, Ford claimed that Darling's is required to prove at the upcoming jury trial on damages that

Darling's "would have remained Blue Oval Certified during the subject time period . . . ." (Resp't's S.M.F ¶ 44.)[2]

25. The BOC was followed by a series of other programs which *may be* replacement programs as to be determined by the jury. (Pet'r's S.M.F. ¶¶ 6-16).

**ANALYSIS**

There are three issues at bar, all of which can be resolved under *Ford II.*

I.    Accrual Period Ran Until Date Board's Final Decision on Darling's Statutory Protest

The Law Court has already settled the question of accrual date. In *Ford II*, the Law Court noted that given the statutory process involved, "had Ford complied with the notice provision and had Darling's filed a protest that proved to be unsuccessful, Ford would have had to continue making BOC payments to Darling's for no more than 270 days. Here, however, Ford did not comply with the statutory requirements..." *Ford II* at ¶ 27. The Law Court elaborated further that "Ford has always had the power to stop damages from accruing further by simply complying with the notice requirement of the statute" necessary to trigger Darling's statutory protest option and allow the Board to determine whether Ford had good cause to modify the agreement. *Ford II* at ¶¶ 34, 32. A franchise modification becomes effective if "either (1) the dealer does not file a protest with the Board within ninety days, or (2) the dealer files a protest and the Board determines that good cause exists for the modification." *Ford II* at ¶ 32.

There is no debate that after *Ford II*, Ford complied with the statute, Darling's unsuccessfully protested, and the Board issued its final ruling on its finding of good cause in Ford's favor. The Board's decision was not appealed. The Board's written order ended the statutory

---

[2] Darling's asserts this was the first time Ford raised the argument, and Ford counters that it made the argument in its 2018 closing arguments to the Board. The dispute is immaterial since both dates occurred long after the September 2014 jury trial on damages. Indeed, attempting to make an eligibility argument now—two jury trials (one on liability and one on damages) and two Law Court appeals later—is too late.

protest on March 18, 2019 and damages stopped accruing. Partial summary judgment on this issue is granted in favor of Ford.

## II.    Proof of Eligibility is an Element of Liability Not Damages

Darling's was not required to prove continued eligibility[3] under the BOC during the first jury damages trial in September 2014, and won't be this time around, either. The issue of eligibility was settled in January 2014 when the *Ford I* Court affirmed the 2011 BCD jury's finding of liability against Ford. Even before that, at the first Board hearing Ford stipulated to Darling's eligibility and the amount Darling's would have earned under the BOC. After the original damages award was vacated, on remand Ford again stipulated to the amount Darling's would have earned under the BOC. In neither instance did Ford raise eligibility. In 2016 the *Ford II* Court again affirmed Ford's liability and addressed damages the way the parties had been presenting them – as statutory damages coterminous with contractual damages. *See Ford II* at n.7. Eligibility was not raised as an issue. On this second go-around, Ford cannot not advance a new line of attack that has long been settled as law of the case. To the extent Darling's eligibility has not been established as law of the case, Ford has waived the issue. The jury trial on damages that will now be conducted will be essentially the same as in September 2014, with the accrual date established and the availability of off-sets for BOC replacement programs.

Accordingly, Ford's motion for summary judgment is denied. Darling's motion for partial summary judgment is granted.

## III.    Blue Oval Replacement Programs Offset Damages

The Law Court has also already held that the Accelerated Sales Challenge ("ASC") replaced BOC and payments made under ASC could be used to offset damages owed under BOC.

---

[3] The court views Ford's hearing the eligibility and certification differ to be a red herring. Without certification, a dealership would not eligible, therefore in this context, they are interchangeable.

*Ford II* at ¶¶ 38-43. As thoroughly explained in *Ford II*, it is appropriate for the jury to consider subsequent programs to BOC, and thus those that followed ASC, to determine if the programs were substitute programs and offset the BOC damages with the payments made to Darling's under them. Summary judgment here is granted in favor of Ford.

## CONCLUSION

Ford's Motion for Summary Judgment is granted in part and denied in part. Darling's Motion for Partial Summary Judgment is granted in part and denied in part.

In sum, the court will conduct a jury trial essentially identical to the September 2014 jury trial on the issue of damages. The only new information that may be presented is the accrual date and evidence of substitute programs to offset damages that accrued through March 18, 2019.

So Ordered.

The Clerk is instructed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: **11/08/2022**

Michael A. Duddy
Judge, Business and Consumer Court

Entered on the docket: 11/10/2022

9

**Ford Motor Company v. Darling's and Matthew Dunlap**
**BCD-AP-08-01**


**Ford Motor Company**
    **Petitioner / Plaintiff**

       Counsel:                 Daniel Rosenthal, Esq
                            Lee Bals, Esq.
                            **Marcus Clegg.**
                            One Canal Plaza – Suite 600
                            Portland, ME 04101-4035


**Darling's**
    **Respondent / Defendant**

       Counsel:                 Judy Metcalf, Esq.
                            **Metcalf Law**
                            76 Union Street
                            Brunswick, ME 04011

                            Noreen Patient, Esq.
                            **Darlings**
                            262 Bath Rd
                            Brunswick, ME 04011


**Matthew Dunlap**
    **Respondent / Defendant**

       Counsel:                 Jonathan Bolton, AAG
                            **Office of Attorney General**
                            6 State House Station
                            Augusta, ME 04333-0006


**Maine Automobile Dealers Association**
    **Intervenor**

       Counsel:                 Matthew Warner, Esq
                            Michael Kaplan, Esq.
                            **Pretti Flaherty**
                            One City Center
                            PO Box 9546
                            Portland, ME 04112

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT ✓
LOCATION: Portland
Docket No. BCD-WB-AP-08-01
       BCD-WB-AP-08-02
       BCD-WB-AP-10-05

FORD MOTOR COMPANY,

      Petitioner,

  v.

DARLING'S, et al.,

      Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PETITIONER'S MOTION
TO BAR DISCOVERY, ARGUMENT
AND EVIDENCE REGARDING
"GOOD CAUSE" PURSUANT TO 10
M.R.S.A. § 1174(3)(B)**

Respondent Darling's moves to bar Petitioner Ford Motor Company ("Ford") from seeking discovery or presenting evidence or legal argument as to whether Ford had "good cause" to terminate the Blue Oval Certification program. Darling's argues that the issue of "good cause" is not relevant to the jury's damages determination because Ford has not, and chose not to comply with the statutory prerequisite for raising the issue. Ford counters that "good cause" is relevant because the statutory process makes it a prerequisite for determining damages.

The court held oral argument on Darling's motion to bar discovery, argument, and evidence regarding "good cause" on July 9, 2014. For the reasons discussed below, the Court grants Darling's motion.

## BACKGROUND

The Law Court aptly summarized the history of this nearly eight year old case in *Ford Motor Co. v. Darling's*, 2014 ME 7, 86 A.3d 35 ("*Darling's*"). The court presumes familiarity with *Darling's* and offers an abridged version of the case's facts and procedural history.

The franchise relationship between Ford, an automobile manufacturer and franchisor, and Darling's, a Ford dealer and franchisee, began in 1989 when the parties entered into a written agreement known as the Ford Service and Sales Agreement ("SSA"). *Darling's*, 2014 ME 7, ¶¶ 2, 4, 86 A.3d 35. In 2000, Ford introduced the Blue Oval Certified ("BOC") program, a customer satisfaction incentive program that offered Ford dealers a 1.25% cash bonus on the retail price of each vehicle the dealer sold. *Id.* at ¶ 5. The BOC program was described in "reference guides" issued between 2001 and 2004. *Id.* The guides identified certification requirements for each year of the program, but did not describe any requirements beyond March 31, 2005. *Id.* In August 2004, Ford made a broadcast on its internal Fordstar television network announcing to dealers that the BOC program would conclude by March 2005 and be replaced by another program. *Id.* On April 1, 2005, Ford discontinued the BOC program. *Id.* In December 2006, Darling's filed a twelve-count complaint before the Maine Motor Vehicle Franchise Board (the "Board"). *Id.* at ¶ 7.

Count X of Darling's Amended Complaint to the Board—the only count at issue— explains that Darling's agreed to modify the SSA to participate in the BOC Program. Exhibit C to Ford's Opposition, Darling's Amended Complaint, ¶ 118. Darling's alleges that Ford's discontinuance of the BOC program constitutes an attempt to modify the SSA without certified written notice in accordance with 10 M.R.S.A. § 1174(3)(B) of the Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers Act ("Dealers Act").[1] *Id.* at ¶ 119. Darling's claims it was harmed by this conduct and requests "an award of damages equal to the loss of the financial remuneration wrongfully removed from Darling's contract without complying with 10 M.R.S.A. § 1174(3)(B). *Id.* at ¶ 121.

---

[1] Unless otherwise noted, all references and citations to statutory sections are to the Dealers Act.

The Parties argued their dispute before the Board, this court, and the Law Court. In *Darling's*, the Law Court resolved all issues in Darling's Amended Complaint except for the question of what damages are owed to Darling's. In particular, *Darling's* held: (1) the SSA and the BOC program were part of the overall franchise agreement that existed between Ford and Darling's (¶ 27); (2) compliance with section 1174(3)(B)'s notice requirement is mandatory, and Ford's failure to provide said notice violated the statute (¶ 31); (3) the presumption contained in section 1189-B(2) in favor of factual findings by the Board is consistent with, and does not unduly burden, the right to trial by jury (¶ 40); (4) the Board's award of one civil penalty for Ford's violation of the Dealers' Act, was proper (¶¶ 49-50); and (5) the Board lacked jurisdiction to award damages to Darling's under the Dealers Act (¶¶ 46-48). Consistent with the fifth determination, the Law Court vacated the Board's award of $145,223.08 in damages to Darling's and remanded the matter to this court "for a determination of damages." (*Id.* at ¶¶ 48, 50.) As of July 9, 2014, when oral argument was held, Ford has not provided notice in accordance with section 1174(3)(B) to Darling's for business reasons. July 9, 2014 Oral Argument at 34:02-35:08.

## DISCUSSION

Parties may obtain discovery regarding any non-privileged matter that is relevant to the subject matter involved in the pending action. M.R. Civ. P. 26(b)(1). Similarly, parties may generally put forth "relevant evidence." M.R. Evid. 402. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R. Evid. 401. Here, the question presented to the court is whether the "good cause" evaluation is relevant to the jury's determination of Darling's damages. For the reasons

3

discussed below, the court finds the "good cause" determination—along with discovery and evidence related thereto—is not relevant. Therefore, we grant Darling's motion.

### 1. The Plain Language, Structure, and Purpose of the Dealers Act Demonstrate that the "Good Cause" Determination Cannot Take Place Absent Compliance with Section 1174(3)(B)'s Notice Requirement.

The parties do not dispute that Darling's damages are tied to the 1.25% BOC incentive on all new Ford vehicles sold after April 1, 2005. July 9, 2014 Oral Argument at 33:19-34:01. Indeed, Ford conceded at oral argument that Darling's is entitled to some amount of damages based on the 1.25% payment and that the primary question is when Darling's damages stop, or stopped accruing. *Id.* The parties are also in agreement that the purpose of compensatory damages is to return Darling's to the position it would have occupied had the harm not occurred. Darling's Reply ISO Mot. to Bar, 9; Ford's Opp. to Mot. to Bar, 3-4. Where the parties differ, however, is the nature of the harm at issue and the analysis to carry out when determining Darling's damages.

Ford argues that in order to determine the extent of Darling's damages, we must determine what would have happened had Ford complied with section 1174(3)(B)'s notice requirement. Ford's Opp. to Mot. to Bar, 5-6. In particular, Ford argues we must ask: (1) whether Darling's would have filed a protest under section 1174(3)(B) if Ford had satisfied that section's notice requirement, and (2) whether Darling's would have won the protest. *Id.* at 9. Whether Darling's would have won a protest under section 1174(3)(B) turns on whether Ford had "good cause" for discontinuing the BOC program. *See* 10 M.R.S.A. § 1174(3)(B). If Ford had "good cause" for discontinuing the BOC program, then it could have modified the SSA by discontinuing the BOC program. *Id.* Absent "good cause," Ford could not discontinue the BOC without violating section 1174(3)(B) and breaching the SSA. *Id.;* 10 M.R.S.A. § 1182 ("Any

4

contract or part thereof or practice thereunder in violation of any provision of this chapter shall be deemed against public policy and should be void and unenforceable").

Darling's argues that section 1174(3)(B) provides clear procedural steps in order to invoke a protest and that Ford cannot skip the first step—providing statutory notice—and then argue that a subsequent step should be considered when determining damages. Darling's Mot.to Bar, 5-6.

When interpreting a statute, courts "first examine the plain meaning of the statutory language, seeking to give effect to the legislative intent, and construe that language to avoid absurd, inconsistent, unreasonable or illogical results." *Melanson v. Belyea*, 1997 ME 150, ¶ 4, 698 A.2d 492 (internal citations omitted). "In construing a statute, [courts] consider not only the plain language, but the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the legislature, may be achieved." *Guaranty Fund Management Services v. Workers' Compensation Bd.*, 678 A.2d 578, 581 (Me. 1996) (internal quotation omitted). Courts may "not read additional language into a statute." *Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667.

### a. The Plain Language of Section 1174(3)(B) Indicates the "Good Cause" Determination Cannot Occur Absent Statutory Notice.

Section 1174(3)(B) provides, in pertinent part, that in order to enact a modification that "substantially and adversely" affects a dealer's rights, the franchisor/manufacturer must provide "90 days' written notice by certified mail of the proposed modification" to the dealer. 10 M.R.S. § 1174(3)(B). This notice requirement is strictly construed. *Darling's*, 2014 ME 7, ¶ 30, 86 A.3d 35. Even actual notice provided to the dealer through alternative means does not satisfy section 1174(3)(B)'s notice requirement. *Id.* at ¶ 31. Once notice is provided in accordance with section 1174(3)(B), a dealer has 90 days to file a protest with the Board requesting a

5

determination of whether the franchisor/manufacturer has "good cause" to enact the proposed modification. 10 M.R.S.A. § 1174(3)(B). The Board must schedule a hearing and decide whether there is "good cause" for the proposed modification within 180 days from the date the protest is filed. *Id.* While the Board is resolving the protest, the proposed modification may not take effect. *Id.* In the face of a protest, a franchisor/manufacturer cannot enact the proposed modification absent "good cause." *See id.*

The plain language of Section 1174(3)(B) demonstrates that the "good cause" evaluation only arises after (1) the manufacturer/franchisor complies with the statute's notice requirement and (2) the dealer files a protest with the Board. *Id.* If either step is missing, the "good cause" determination does not take place and the proposed modification cannot go into effect. *See id.* The court will not read additional language into section 1174(3)(B). *Blue Yonder, LLC,* 2011 ME 49, ¶ 10, 17 A.3d 667. This includes Ford's suggestion that the court can determine "good cause" absent compliance with the section 1174(3)(B)'s notice requirement.

This interpretation is also consistent with the Law Court's emphasis on the strict construction of section 1174(3)(B)'s notice requirement. *Darling's,* 2014 ME 7, ¶¶ 30-31, 86 A.2d 35. If strict compliance with the notice requirement is necessary, it follows that the statutory process initiated by providing that notice cannot proceed absent the requisite notice.[2] It is also consistent with the prospective nature of the statute. Section 1174(3)(B) focuses on prospective modifications to franchise agreements, not the damages arising from an unlawfully enacted modification.

---

[2] This interpretation is consistent with the Law Court's finding that Ford's failure to provide Darling's the notice required by section 1174(3)(B) "prejudiced Darling's by *depriving it of the opportunity* provided by section 1174(3)(B) to file a protest and request a determination by the Board as to whether Ford had good cause for the modification." *Darling's,* 2014 ME 7, ¶ 30, 86 A.3d 35 (emphasis added).

6

The cases Ford cites in support of its analysis that the "good cause" evaluation must take place are inapposite in light of *Darling's*. Ford's Opp. to Mot. to Bar, 8. *Ganley v. Mazda Motor of Am., Inc.* states that Ohio courts have "repeatedly held that a manufacturers procedural slips are not fatal under the [Ohio] Dealers Act[.]" 2010 WL 697360, **7 (6th Cir. Mar. 2, 2010). Similarly, *Chrysler Corp. v. Bowshier* held that the Ohio equivalent of the Board erred in determining that a manufacturer's failure to comply with a 30-day notice requirement regarding an intent to sell or transfer a franchise was dispositive in a protest case because the ultimate issue was whether good cause existed to refuse the sale or transfer. 2002 WL 465118, *4-5 (Ohio Ct. App. Mar. 28, 2002). While Ohio courts may treat procedural slips with leniency, under the Maine Dealers Act, the Law Court interpreted section 1174(3)(B)'s notice requirement strictly. *Darling's*, 2014 ME 7, ¶¶ 30-31, 86 A.3d 35. In particular, *Darling's*, held section 1174(3)(B)'s notice requirement was mandatory, and must be met even when the dealer has actual knowledge of the proposed modification. *Ibid.* Accordingly, whether Ford had "good cause" to terminate the BOC program is not relevant to determining Darling's damages because Ford has not satisfied the statutory prerequisite of proper notice.

> b. Importing "Good Cause" into Determining Darling's Damages Absent Statutory Notice is Contrary to the Legislature's Intent in the Dealers Act.

The Dealers Act was crafted out of a desire to "protect dealers from actions by manufacturers that were perceived as abusive and oppressive" in light of "[t]he disparity in bargaining power between automobile manufacturers and their dealers." *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 827-28 (D. Me. 1994); *aff'd in part, rev'd in part on other grounds*, 44 F.3d 1050 (1st Cir. 1995). Section 1174(3)(B) was drafted, in part, to impose a strict notice requirement that manufacturers highlight modifications to a franchise that "substantially and adversely" affect the dealer's rights, obligations, investment or return on

7

investment. *Darling's*, 2014 ME 7, ¶ 30, 86 A.3d 35. Allowing Ford to adjudicate the question of "good cause" absent compliance with section 1174(3)(B)'s notice requirement, would run counter to the Dealers Act's goal of protecting dealer's from manufacturer abuses by reducing the cost for manufacturers of not complying with section 1174(3)(B) and by reducing the incentive for manufacturers to provide dealers with clear notice of proposed substantial and adverse modifications to franchise agreements. Because the court is required to give effect to the legislative intent when interpreting a statute, "good cause" is not relevant to determining Darling's damages absent the requisite notice. *Melanson*, 1997 ME 150, ¶ 4, 698 A.2d 492.

### c. The Law Court's Remand to This Court Indicates "Good Cause" is Not Relevant to Determining Darling's Damages.

Darling's argues that the Law Court considered the entire statutory framework of the Dealers Act and then specifically remanded this case to the present court. Darling's Reply ISO Mot. to Bar, 8. As such, Darling's argues the Law Court did not intend for there to be a "good cause" adjudication because if it did, the Law Court would have remanded the matter to the Board. *Id.*

The Board was established as a forum "with specific expertise in the motor vehicle industry" in order to promptly resolve "complex and time-consuming litigation." *Darling's*, 2014 ME 7, ¶ 39, 86 A.3d 35 (quoting L.D. 1294, Summary (121st Legis. 2003). For example, the majority of Board members must have experience as franchisees or franchisors. *See* 10 M.R.S. § 1187(1). In accordance with the Board's expertise, the Dealers Act provides that all findings of fact by the Board are presumed correct unless rebutted by clear and convincing evidence. 10 M.R.S. § 1189-B(2); *see also Darling's*, 2014 ME 7, ¶ 39, 86 A.3d 35 (the Dealers Act "reflects a legislative judgment that the factual determinations of an administrative board –

one with expertise in the specialized area of motor vehicle franchise relationships – are sufficiently reliable as to require a heightened standard of proof before they are disregarded").

Evaluating "good cause" under section 1174(3)(B) requires a highly fact specific determination. In particular, relevant factors include:

> (1) The reasons for the proposed modification; (2) Whether the proposed modification is applied to or affects all motor vehicle dealers in a nondiscriminatory manner; (3) Whether the proposed modification will have a substantial and adverse effect upon the motor vehicle dealer's investment or return on investment; (4) Whether the proposed modification is in the public interest; (5) Whether the proposed modification is necessary to the orderly and profitable distribution; and (6) Whether the proposed modification is offset by other modifications, beneficial to the motor vehicle dealer.

10 M.R.S.A. § 1174(3)(B)(1)-(6). Accordingly, the deference provided to the Board's findings of fact and the fact-intensive nature of the "good cause" evaluation, make clear that the legislature intended the Board, not the courts, to evaluate "good cause" in the first instance.

The Law Court's decision to remand the case to this court, and not the Board, indicates "good cause" is not relevant to determining Darling's damages. In *Darling's*, the Law Court provided in-depth analysis of the different functions and jurisdiction of the Board vis-à-vis the Superior Court under the Dealers Act. 2014 ME 7, ¶¶ 16-22, 41-49, 86 A.3d 35. As part of that analysis, *Darling's* determined that the Board lacked jurisdiction over actions seeking damages and that its earlier damages determination "is not to be treated as a factual finding subject to the presumption of correctness established by section 1189-B(2)." *Id.* at ¶¶ 46-47. In light of the Law Court's in-depth analysis of the different functions and jurisdiction of the Board and the Superior Court, it stands to reason that the Law Court would have specified the "good cause" question should be remanded to the Board—the only body qualified to evaluate "good cause"— if it were relevant to determining Darling's damages. While we do not base our decision on the

9

Law Court's implicit statement that "good cause" is not relevant to determining Darling's damages, *Darling's* is, at the least, consistent with this interpretation.[3]

### 2. Ford's Arguments That "Good Cause" is a Necessary Step in Determining Darling's Damages Are Not Persuasive In Light of the Text, Structure and Purpose of the Dealers Act.

Ford raises a number of arguments as to why "good cause" is a relevant, and indeed necessary step in determining Darling's damages. As discussed below, however, none of Ford's arguments account for the plain import of the Dealers Act's language, structure, and purpose that the "good cause" evaluation does not arise absent compliance with section 1174(3)(B)'s notice requirement.

#### a. Ford Argues "Good Cause" Must Be Evaluated Because it Flows From the Statutory Violation Ford Committed.

Ford argues that Count X of Darling's Amended Complaint is a limited action that was brought solely under section 1174(3)(B). Ford's Opp. to Motion to Bar, 5. As such, Ford argues that its violation was the failure to comply with section 1174(3)(B)'s notice requirement and that Darling's damages must be determined pursuant to the process established in that section. *Id.* at 6-8. Ford further argues that the Law Court already rejected Darling's argument that Ford violated the statute each time Darling's sold a vehicle and did not receive a 1.25% BOC incentive payment from Ford. *Id.* at 6. In support, Ford cites to the Law Court's affirmation of the Board imposing a single civil penalty against Ford because "Ford only modified the franchise without providing notice once (at least for the purposes of this dispute), it violated section 1174(3)(B) once...." *Darling's*, 2014 ME 7, ¶ 50, 86 A.3d 35. Darling's replies that Count X

---

[3] We note that because the Law Court remanded the case to this court for a damages determination, it must have implicitly determined that even though Darling's improperly sought damages from the Board, Count X of its Amended Complaint successfully made out a claim for damages pursuant to Section 1173 of the Dealers Act.

10

did not seek a remedy for the violation of a statutory right, but instead sought damages based on Ford's unlawful, unilateral modification of the SSA. Darling's Reply ISO Mot. to Bar, 2.

"The purpose of a complaint in modern notice pleading practice is "to provide defendants with fair notice of the claim against them." *Hamilton v. Greenleaf*, 677 A.2d 525, 527 (Me. 1996). With this purpose in mind, it is clear that Darling's sought damages based on Ford's modification—and breach—of its franchise agreement with Darling's. This is because Count X of Darling's Amended Complaint is premised on Ford violating section 1174(3)(B) by modifying Darling's SSA through its discontinuance of the BOC program and seeks "an award of damages equal to the loss of the financial remuneration wrongfully removed from Darling's contract [by Ford] without complying with 10 M.R.S.A. § 1174(3)(B)." Exhibit C to Ford's Opposition, Darling's Amended Complaint, ¶¶ 119, 121. Therefore, while Ford is correct that Count X is premised on a violation of section 1174(3)(B), the result of that violation—which Darling's seeks to remedy—was a breach of contract (i.e. the SSA). Based on this language, it cannot be said—and Ford has not claimed—that it was unaware of the scope of damages Darling's seeks. Indeed, Ford conceded that Darling's damages would be based on the 1.25% incentive payments under the BOC. July 9, 2014 Oral Argument at 33:19-34:01.

Furthermore, even if Count X was a limited cause of action under section 1174(3)(B), this would not make "good cause" relevant. The fact remains that Ford did not provide the requisite notice necessary to trigger the "good cause" determination under section 1174(3)(B). Similarly, it is irrelevant that the Law Court characterized Ford's actions as a single violation when affirming the Board's civil penalty. *See Darling's*, 2014 ME 7, ¶¶ 49-50, 86 A.3d 35. It is common knowledge that a one-time violation of a statute or a single breach of contract—when not cured—can result in multiple or continuing damages. Accordingly, regardless of how Ford's

11

violation is characterized, the "good cause" evaluation is not relevant to determining Darling's damages because Ford has not provided the requisite notice under section 1174(3)(B).

### b. Ford Argues the "Good Cause" Evaluation Must be Performed in Light of Case Law Performing a Similar "Trial Within a Trial" Analysis.

As discussed above, Ford's central argument is that in order to compensate Darling's we must begin with the counterfactual scenario wherein Ford provided the requisite notice to Darling's under section 1174(3)(B). Ford's Opp. to Mot. to Bar, 7. We must then ask whether Darling's would have filed a protest, and whether it would have won. *Id.* In other words, we would have to hold a trial within a trial. Ford cites a plethora of case law in which courts have carried out a trial within a trial when establishing causation and/or damages. *Id.* at 9-12. None of these cases, however, involved a scheme analogous to section 1174(3)(B) in which the trial within a trial could only take place following satisfaction of a strict gate-keeping requirement like section 1174(3)(B)'s notice provision. *See Snow v. Villacci*, 2000 ME 127, ¶ 16, 754 A.2d 360 (negligence claim wherein trial within a trial focused on lost earning opportunity); *Gulesian v. Northeast Bank of Lincoln*, 447 A.2d 814, 817 (Me. 1982) (misrepresentation claim turning on whether plaintiff could have prevented wife from accessing funds); *Wright v. St. Mary's Medical Center of Evansville, Inc.*, 59 F.Supp.2d 794 (S.D. Ind. 1999) (breach of contract and negligence claims turning on whether third-party claim would have succeeded); *Hallingby v. Hallingby*, 693 F.Supp.2d 360, 368-69 (S.D.N.Y. 2010) (involving breach of settlement agreement and private annuity contract)[4]; *Mattco Forge, Inc. v. Arthur Young & Co.*, 52 Cal.App.4th 820 (1997) (legal

---

[4] Despite Ford's reliance on *Hallingby*, this case counsels against carrying out a trial within a trial here. In *Hallingby*, the Husband procured annuities providing monthly payments to Husband after he retired. *Id.* at 362. Husband designated his first wife ("Ex Wife") as the survivor annuitant who would receive the payments after Husband's death. *Id.* Husband retired and the annuities vested. *Id.* The annuities restricted Husband's ability to name the survivor annuitant for any reason after the annuities vested. *Id.* Husband and Ex Wife divorced. *Id.* at

12

malpractice claim affirming use of trial within a trial inquiry for legal malpractice claims); *Jones v. O'Brien Tire and Battery Service Center Inc.*, 871 N.E.2d 98, 102-03 (Ill. App. Ct. 2007) (spoliation of evidence case turning on whether plaintiff would have declined to settle and prevailed at trial); *Goldberg v. Boone*, 912 A.2d 698 (Md. Ct. App. 2006) (medical malpractice case turning on alleged failure to disclose); *Thomas v. Bethea*, 718 A.2d 1187 (Md. Ct. App. 1998) (legal malpractice claim affirming use of trial within a trial inquiry); *Oliver v. Stimson Lumber Co.*, 993 P.2d 11, 21 (Mont. 1999) (spoliation of evidence case turning on whether plaintiff would have won underlying suit were the evidence available); *Kranendonk v. Gregory & Swapp, PLLC*, 320 P.3d 689 (Ut. Ct. App. 2014) (legal malpractice claim laying out proper standard for "trial-within-a-trial" determination). Accordingly, while the court does not dispute that a trial within a trial can be an appropriate test to resolve questions of causation and damages, it is not appropriate here, in light of the text, structure, and purpose of the Dealers Act, which makes compliance with section 1174(3)(B)'s notice requirement a mandatory prerequisite before commencing a "good cause" evaluation.

---

363. Ex Wife entered a settlement agreement stating that she had no right to the annuities payments. *Id.* Husband married New Wife and submitted a change-of-beneficiary request to the annuities provider, MetLife, to replace Ex Wife with New Wife as the survivor annuitant. *Id.* Metlife declined the request. *Id.* Husband passed away and shortly thereafter New Wife sued Ex Wife for breach of contract and unjust enrichment because Ex Wife received annuities payments. *Id. Hallingby* held that Ex Wife breached the settlement agreement by retaining the annuities, but that New Wife was unable to establish she or the estate suffered actual damages because New Wife did not prove Metlife would have honored the Settlement Agreement and made the payments to New Wife or the estate. *Id.* at 368-39. Instead, the court explained that MetLife may have determined Ex Wife's waiver of rights to payments under the annuities would have transformed the annuity to a life annuity that extinguished upon Husband's death. *Id.* In other words, the court found damages were uncertain because New Wife did not present sufficient evidence demonstrating what MetLife would have done had Ex Wife performed under the Settlement Agreement and if New Wife had sent a change of beneficiary designation. *Id.* This is the inverse of the situation presented in our case because Ford, who is seeking to carry out a trial within a trial, is the party who prevented the necessary underlying information from becoming sufficiently certain by not providing notice as required by section 1174(3)(B).

13

c. Ford Argues This Court Already Determined Section 1174(3)(B) Does Not Mandate the Damages Darling's Demands.

Ford argues that in an Order dated February 1, 2012, this court determined that section 1174(3)(B) does not compel the court to award a 1.25% BOC incentive payment on every Ford vehicle Darling's sells until and unless Ford issues certified-mail notice and a protest can be heard. Ford's Opp. to Mot. to Bar, 13. Darling's responds that the language relied on in the Order by Ford is dicta and, in any event, was reversed by the Law Court in *Darling's*. Darling's Reply ISO Mot. to Bar, 12-14.

The "law of the case" provides that a trial justice should not overrule or reconsider the decision of another justice in subsequent proceedings involving the same case, "unless corrected by appellate review." *Monopoly, Inc. v. Aldrich*, 683 A.2d 506, 510 (Me. 1996). "However, not every statement made or word written by a judge while rendering a decision automatically becomes the law of the case." *McConaghy v. Sequa Corp.*, 294 F.Supp.2d 151, 160 (D. R.I., 2003). In order to constitute "law of the case" an "issue must be actually decided on the merits[.]" *Id.* (citation omitted). "Thus, by definition, dicta cannot constitute law of the case." *Id.* (citing *Bull HN Information Systems, Inc. v. Hutson*, 229 F.3d 321, 326 n. 3 (1st Cir. 2000). Dicta constitutes "[o]pinions of a judge which do not embody the resolution or determination of the specific case before the court." *Id.* (quoting Black's Law Dictionary 454 (6th Ed. 1990); *see also Legault v. Levesque*, 107 A.2d 493, 496 (Me. 1954) (Obiter dictum is "an assertion of law not necessary to the decision of the case").

In the February 1, 2012 Order, this court noted that "actual notice, good cause and waiver are arguably significant to the damages issues raised by both Ford and Darling's." Exhibit F to Ford's Opposition, 2/1/2012 Order, 4. This court further explained that section 1174(3)(B) is silent on the damages to which Darling's is entitled and that the statute "does not explicitly

14

require the Board to award Darling's damages in an amount equal to the 1.25% incentive payment on every vehicle sold by Darling's after April 1, 2005." *Id.* The court then explained that "in the absence of a specific statutory prescription for the calculation of damages, the Board presumably has the discretion to consider a variety of pertinent factors" when determining Darling's damages. *Id.* at 5-6. Accordingly, the court determined that as long as "the Board does not act in an arbitrary manner, and provided that the Board's determination is supported by substantial evidence on the record, the Board is afforded the discretion to assess the damages that it finds are related to the violation." *Id.* at 6. However, because the Board's basis for its damages determination was unclear, the court remanded the matter to the Board for further findings in support of its damages award. *Id.* at 7.

The foundation of the preceding statements—the Board's presumed discretion in assessing damages— was overruled by *Darling's*, which held that the Board was not empowered to award damages and that the Board's factual findings thereon were not subject to a presumption of correctness. 2014 ME 7, ¶¶46-48, 86 A.3d 35. Accordingly, the preceding statements do not constitute "law of the case." Furthermore, while it remains true that section 1174(3)(B) does not "mandate a particular damage calculation," it is equally true that section 1174(3)(B) does not prohibit awarding damages based on the BOC payments for each vehicle Darling's sold after April 1, 2005. Exhibit F to Ford's Opposition, 2/1/2012 Order, 5-6. Instead, section 1174(3)(B) is silent on damages. *Id.* Finally, while section 1174(3)(B) is silent on damages, the parties have agreed that the purpose of damages in the present case under section 1173 is to return Darling's to the position it would have occupied had Ford not modified the SSA by discontinuing the BOC program without complying with section 1174(3)(B). Darling's Reply

15

ISO Mot. to Bar, 9; Ford's Opp. to Mot. to Bar, 3-4. The damages resulting from this modification is a question trusted to the fact-finding abilities of the jury.

## CONCLUSION

The plain language, structure, and purpose of the Dealers Act, and section 1174(3)(B) in particular, demonstrate that the "good cause" determination under section 1174(3)(B) cannot take place absent compliance with section 1174(3)(B)'s notice requirement. Accordingly, because Ford has not provided notice under section 1174(3)(B), whether it had "good cause" for discontinuing the BOC program is not relevant to determining Darling's damages.

The entry will be: Darling's motion to bar discovery, argument, and evidence regarding "good cause" pursuant to 10 M.R.S.A. § 1174(3)(B) is GRANTED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: July 30, 2014

Justice Michaela Murphy
Business and Consumer Docket

16

**Ford Motor Company v. Darling's and Matthew Dunlap**
**BCD-AP-08-01**


**Ford Motor Company**
    **Petitioner / Plaintiff**

        Counsel:                     Daniel Rosenthal, Esq.
                                    One Canal Plaza – Suite 600
                                    Portland, ME 04101-4035


**Darling's**
    **Respondent / Defendant**

        Counsel:                     Judy Metcalf, Esq.
                                    PO Box 9
                                    167 Park Row
                                    Brunswick, ME 04011


**Matthew Dunlap**
    **Respondent / Defendant**
        Counsel:                     Linda Conti, AAG
                                    6 State House Station
                                    Augusta, ME 04333-0006

STATE OF MAINE
CUMBERLAND

BUSINESS AND CONSUMER DOCKET
BCD-AP-08-01
BCD-AP-08-02
BCD-AP-10-05

MMM-CUM-04-29-14

FORD MOTOR COMPANY,

    Petitioner,

v.

DARLING'S, et al.,

    Respondents.

**ORDER ON PETITIONER'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## Introduction

On January 21, 2014 the Law Court remanded this matter to the Superior Court for a determination of damages. *Ford Motor Company v. Darling's et al.*, 2014 ME 7, 86 A.3d 35. In its decision, the Law Court found that under the so-called "Dealer's Act," 10 M.R.S. §§1171 to 1190-A (2013), the Maine Motor Vehicle Franchise Board (Board) lacked "jurisdiction over actions seeking damages pursuant to the Dealer's Act." *Id.* ¶ 41. The Law Court vacated the aspect of the Judgment of the Business and Consumer Docket (BCD), which awarded monetary damages, while affirming all other aspects of that Judgment. And in the third paragraph of the opinion, the Law Court stated that it would "remand the case to the Business and Consumer Docket for a determination of damages by a jury." *Id.* ¶ 3.

The Court conferenced the matter on March 10, 2014 and granted Ford Motor Company's request to file the Motion for Partial Summary Judgment that is now before the Court. Ford Motor Company (Ford) is represented by Attorney Daniel L. Rosenthal. Darling's is represented by Attorney Judy A.S. Metcalf and Attorney Noreen A. Patient. Intervenor Maine Automobile Dealers Association (MADA) is represented by Attorney Michael Kaplan. The Secretary of State is represented by Assistant Attorney General Linda J. Conti.

1

The Court has reviewed the filings of the parties, the last of which was received on April 25, 2014,[1] the relevant statutes, the prior Orders issued by Justice Nivison, the controlling decision from the Law Court referenced above, and enters the following Order denying Ford's Motion for Partial Summary Judgment.

## DISCUSSION

Ford makes a number of arguments. Primarily, it argues that Darling's did not, perhaps for tactical reasons, pursue damages in accordance with the statute in question. Ford claims that now that the Law Court has clarified that section 1173 governs the right to recover damages under the Dealer's Act, Darling's has forfeited its right to obtain any damages as it never filed a 1173 claim in the Superior Court. Ford also argues that the Law Court's use of the word "jury" in the first paragraph was inadvertent or perhaps some kind of clerical error, and that any determination of damages—if one can be made at all—should be made by the Court without a jury.

At the outset, the Court would agree with the statement from MADA's counsel that this matter presents itself here "through a procedurally byzantine and years-long process." (MADA's Opposition, pg. 2). The Court would further note that in order to arrive at its decision, the Law Court had to reconcile "the unique administrative process fashioned by the Dealers Act" with "an assemblage of legal and factual determinations by the Board, the jury's decision to uphold the Board's factual findings, and legal conclusions," the Superior Court's original and appellate jurisdiction in these cases, as well as the Maine Constitution's guarantee in Article 1, Section 20 of a party's "right to have a determination made by the jury on material questions of fact." *Ford Motor Co.*, 2014 ME 7, ¶¶ 13, 19-21, 32-40, 86 A.3d 35.

The issues that remain for resolution before this Court are simple by comparison. The Court must follow the mandate of the Law Court, as well as the law of the case as established in the Law Court's opinion. The Court concludes after review of the Law Court's decision and the parties' arguments that it is compelled to convene a jury trial [2] to determine the factual issue of damages.

---

[1] The Secretary of State did not file a memorandum in opposition to the motion. The Secretary instead, through counsel, notified the Court by letter dated April 10, 2014 that he would be taking no position on Ford's motion.

[2] The Court is informed by the Clerk of the BCD that Darling's paid a jury fee on March 17, 2014.

There are no material issues of fact in dispute as to what occurred during this litigation which would prevent this Court from finding that Darling's never forfeited its right to a jury trial by not initiating a claim for damages under section 1173 matter in the Superior Court. Indeed, as Darling's and MADA point out, Darling's pressed its claim for damages throughout the Board process, during the appellate hearing process before the BCD, and before the Law Court. Further, Darling's failure to file a separate complaint in the Superior Court seeking damages under section 1173 is not fatal to its demand for a jury trial now because, as MADA points out, under Rule 80C(i) such an independent claim could be joined with Rule 80C claims. More to the point in this matter, the Law Court found that "once a proceeding before the Board is completed and an appeal is taken on the merits pursuant to section 1189-B(2), a franchisee may then bring its action for damages pursuant to section 1173 *as part of* a hearing before the Superior Court." *Id.* ¶ 44 (emphasis added). Further, in its mandate, the Law Court ordered unambiguously as follows: "Remanded to the Superior Court for a determination of damages." *Ford Motor Co.*, 2014 ME 7, 86 A.3d 35. The Law Court clearly found that Darling's claim for damages is still viable, if those damages can be proven by a preponderance of evidence.

Any determination of damages previously made in this matter, as part of the administrative proceeding under Rule 80C either before the Board or the Superior Court, has been voided by the Law Court. It is not lost on the Court that if it were to agree with Ford's analysis, then Darling's has no forum to request damages. That result would seem to directly violate the mandate, as well as other language in the opinion which clarifies how damages claims can be made under the statutory scheme as clarified by the Law Court. The Court would further note that Law Court's specific remand was to the Superior Court—the forum which the Law Court indicated has jurisdiction under section 1173 to determine damages in an action that is "*separate* from an administrative complaint filed with the Board pursuant to section 1188(1)." *Id.* ¶ 44 (emphasis added).

Even more fundamentally, Ford's suggestion that the use of the word "jury" on page one of the opinion can and should be ignored by this Court overlooks the obvious constitutional underpinnings of the Law Court's reasoning. That is, there is other language in the opinion which directly refers to Darling's constitutional right to have a jury trial on factual issues. In discussing Ford's argument before the Law Court that section 1189-B(2)'s presumption in favor of the Board's factual findings deprived Ford of *its* constitutional right to a trial by jury, the

3

Court wrote as follows: "Darling's and MADA do not contend that an historical exception to article 1, section 20 of the Maine Constitution applies in this case. *Accordingly, we presume that the 'broad constitutional guarantee to the right to a jury trial' applies to Darling's claims.*" *Id.* ¶ 34 n.11 (emphasis added) (quoting *State v. One Chevrolet Monte Carlo*, 1999 ME 69 ¶ 6, 728 A.2d 1259). In other words, the remand to the Superior Court—the only court in Maine which can provide a trial by jury—must also be understood as the Law Court's ensuring that Darling's right was preserved to prove before a jury, if it can, by a preponderance of evidence, that it suffered damages as a result of Ford's violation of the Dealer Act.

While Ford focuses almost exclusively on the language of the mandate at the end of the Law Court's decision, this Court must also consider language in the opinion, which establishes the law of the case. That law would include the determinations of the BCD that were upheld by the Law Court, including but not limited to the following: that Ford and Darling's had a franchise relationship, which included the Blue Oval Certified Program (BOC); that Ford's termination of the BOC was an attempt to modify a franchise requiring statutorily prescribed notice; that Ford failed to provide notice as required by law; that requiring a heightened burden of proof on the issues presented to the appellate jury did not violate Ford's constitutional right to trial by jury on the questions submitted to the jury in the BCD proceeding; that the Board's award of only one civil penalty was lawful; that the Board has no jurisdiction to award damages; and that Darling's is entitled under the statute and under the Maine constitution to have a jury determine the factual question of damages. None of those settled questions of law are addressed in the mandate, but the Court must nevertheless follow each of them in the next phase of these proceedings.

**The entry will be: Ford's Motion for Partial Summary Judgment is DENIED.**

The Clerk shall note this Order on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure. This case will be set for a telephonic Case Management Conference by the Clerk of the Business and Consumer Docket so the parties and the Court may discuss the course of future proceedings.

4/29/14

DATE

SUPERIOR COURT JUSTICE

**Ford Motor Company v. Darling's and Matthew Dunlap**
**BCD-AP-13-05**


**Ford Motor Company**
    **Petitioner / Plaintiff**

       Counsel:                 Daniel Rosental, Esq.
                               One Canal Plaza – Suite 600
                               Portland, ME 04101-4035


**Darling's**
    **Respondent / Defendant**

       Counsel:                 Judy Metcalf, Esq.
                               P.O. Box 9
                               167 Park Row
                               Brunswick, ME 04011


**Matthew Dunalp**
    **Respondent / Defendant**

       Counsel:                 Linda Conti, AAG
                               6 State House Station
                               Augusta, ME 04333-0006

STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                         Location: Portland
                                        Docket Nos.: BCD-AP-08-01
                                                     BCD-AP-08-02        ✓
                                                     BCD-AP-10-05
                                        JCN - CuM - 2/1/2012


                              )
FORD MOTOR CO.,               )
                              )
              Petitioner,     )
                              )         **DECISION AND ORDER**
     v.                       )
                              )
DARLING'S, ET AL.,            )
                              )
              Respondents     )
                              )


    Following the entry of a judgment after a jury trial on certain issues in this matter, the parties, in accordance with the Court's directive, filed memoranda in which they identified and addressed the issues that the parties believe remain unresolved. The Court will discuss and resolve the issues.

## ISSUES PRESENTED FOR DETERMINATION

    Petitioner Ford Motor Co. (Ford) asserts that the following issues remain pending before the Court:

    (1) whether the Maine Motor Vehicle Franchise Board (the Board) erred as a matter of law when it concluded that Ford's discontinuation of the Blue Oval Certified 1.25% incentive payment (Blue Oval payments) substantially and adversely affected Respondent Darling's (Darling's) return on investment;

    (2) whether the Board erred as a matter of law by failing to make findings on whether Darling's had actual notice of the discontinuation of the Blue Oval payments prior to April 1, 2005;

(3) whether Darling's had actual notice of the discontinuation of the Blue Oval payments prior to April 1, 2005;

(4) whether the Board erred as a matter of law when it failed to find that Darling's waived its rights under 10 M.R.S. § 1174(3)(B) (2011)[1] by failing or declining to file a protest of the discontinuation of the Blue Oval payments prior to April 1, 2005;

(5) whether the Board erred when it failed to determine that Darling's did not incur legally-cognizable damages if Darling's had actual notice of the discontinuance of the Blue Oval payments but failed or declined to file a protest under 10 M.R.S. § 1174(3)(B);

(6) whether the Board erred when it failed to determine that Darling's did not incur any legally-cognizable damages if Ford had good cause for the discontinuation of the Blue Oval payments;

(7) whether the Board erred as a matter of law when if failed to make findings as to whether Ford had good cause for the discontinuation of the Blue Oval payments;

(8) whether Ford had good cause for the discontinuation of the Blue Oval payments; and

(9) whether the Board erred as a matter of law when it failed to find that Darling's failed to mitigate its damages.

Darling's asserts that the following issues remain pending before the Court:

(1) whether the Board erred when it failed to determine that Darling's damages continue to accrue until Ford provides Darling's with the statutorily required advance notice of its decision to terminate the Blue Oval payments and, after doing so, if a timely protest is made, the Board determines that Ford has demonstrated good cause for the modification of the franchise;

---

[1] Title 10 M.R.S. § 1174 has been amended several times since the relevant time period, but not in any way that affects the Court's analysis.

2

(2) whether the Board erred when it limited Darling's total damages to $678,942.96, which represents 1.25% of the manufacturer's suggested retail price of Ford vehicles sold by Darling's from April 1, 2005 through November 30, 2007, despite the fact that Ford has not provided Darling's with the statutorily required certified mail notice informing Darling's of the termination of the Blue Oval payments;

(3) whether the Board erred when it limited Darling's damages to $214,723.08, which represents 1.25% of the manufacturer's suggested retail price for the Ford vehicles sold by Darling's in the first 270 days following April 1, 2005, the date on which Ford terminated the Blue Oval payments;

(4) whether the Board erred when it reduced Darling's damages of $214,723.08 by $68,875 for a total damage award of $145,848, concluding that Darling's earned $68,875 during the 270 day period following April 1, 2005, from other promotional programs; and

(5) whether the Board erred when it imposed a single $10,000 penalty against Ford.

## DISCUSSION

As referenced above, Ford maintains that whether the Board erred when it concluded that Ford's termination of the Blue Oval payments substantially and adversely affected Darling's return on investment remains an issue for the Court's consideration. Contrary to Ford's argument, the issue was resolved as the result of the trial and Ford's post-trial motion.

Through this action, Ford directly challenged the Board's determination that Ford's discontinuation of the Blue Oval payments substantially and adversely affected Darling's return on investment. Pursuant to Ford's request, the issue was tried to a jury. At the conclusion of the trial, the jury answered affirmatively the question of whether "the elimination of the 1.25% payment as part of the Blue Oval Certification program substantially and adversely affected

3

Darling's return on investment." In its post-trial motion, Ford argued that notwithstanding the jury's verdict, the Court should enter judgment as a matter of law in favor of Ford principally because of the way in which the Board interpreted and applied the phrase "return on investment." The Court denied Ford's request, thereby resolving the issue.

Several of the remaining issues identified by Ford are at least in part related to Darling's notice of Ford's intent to terminate the Blue Oval payments. For instance, Ford contends that the Board should have determined that Darling's had actual notice of Ford's decision to terminate, and that because Darling's had actual notice, Darling's did not sustain any legally-cognizable damages. Ford also contends that because Darling's had actual notice of the termination, the Board should have considered whether Ford had good cause to terminate the Blue Oval payments. *See* 10 M.R.S. § 1174(3)(B)(1)-(6) (listing relevant factors in a good cause determination).

The Court has previously addressed the issue of notice. In its Decision and Order dated July 10, 2009, the Court concluded that written certified mail notice was required in order to comply with 10 M.R.S. § 1174(3)(B), and that actual notice was not an adequate substitute. Accordingly, the Board was not required to make findings regarding actual notice and any of the related issues (e.g., filing of protest, good cause, waiver).[2] To the extent, therefore, that Ford contends that the Board erred in failing to make those findings as they relate to Ford's violation of the statute, Ford's argument is unpersuasive.

Nevertheless, Ford's assertions regarding actual notice, good cause and waiver are arguably significant to the damages issues raised by both Ford and Darling's. Darling's argues that the Board improperly limited the damages to which Darling's was entitled as a consequence

---

[2] The statute contemplates the filing of a protest and a good cause assessment only after written certified mail notice is provided. *See* 10 M.R.S. § 1174(3)(B).

4

of Ford's failure to provide written certified mail notice the termination of the Blue Oval payments. In particular, Darling's maintains that the Board committed error when it limited Darling's damages to a 270 day period, and when it reduced the recoverable damages by the amount received by Darling's through an incentive program introduced by Ford upon termination of the Blue Oval payments. Darling's contends that given Ford's failure to provide Darling's with a written certified mail notice, Darling's is entitled to recover the 1.25% incentive payment on each vehicle sold by Darling's from April 1, 2005 until Ford provides the certified mail notice, which Ford has not yet done.

Although 10 M.R.S. § 1174(3)(B) is silent on the damages to which Darling's is entitled as the result of Ford's failure to provide written certified mail notice, Darling's contends that because the modification of the franchise (i.e., the termination of the Blue Oval payments) is not effective without the certified mail notice, the Blue Oval payments must continue. According to Darling's, because Ford did not continue the payments, the Board must order Ford to pay Darling's the Blue Oval payments for each vehicle sold from April 1, 2005 to the present.

The applicable statute does not, however, mandate a particular damage calculation. In fact, the statute does not provide the Board with much guidance in the event it determines that damages are appropriate.[3] The only reference to the amount of a monetary award is 10 M.R.S. § 1171-B(3), which provides for a civil penalty in the event of a violation of the statute. Not insignificantly, the statute does not explicitly require the Board to award Darling's damages in an amount equal to the 1.25% incentive payment on every vehicle sold by Darling's after April 1, 2005. Rather, as mentioned above, the statute is silent on damages. In the absence of a specific

---

[3] Title 10 M.R.S. § 1173(1) (2011) simply allows a "franchisee or motor vehicle dealer who suffers financial loss of money or property, real or personal, or who has otherwise adversely affected as a result of . . . any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief." The statute does not address how those damages should be calculated.

5

statutory prescription for the calculation of damages, the Board presumably has the discretion to consider a variety of pertinent factors when determining whether and to what extent Darling's is entitled to recover damages in the event of a violation of the statute.

Contrary to Darling's arguments, therefore, the Board was not required to award damages for an indefinite period until Ford sent to Darling's a written certified mail notice. While the Court previously concluded that Ford was required to provide a written certified mail notice in order to avoid liability under the statute, the Court did not conclude, nor did the Court intend to suggest, that in this case the Board must award damages in an amount equal to the Blue Oval payments for each vehicle that Darling's has sold or might sell before Ford provides written certified mail notice to Darling's. Provided that the Board does not act in an arbitrary manner, and provided that the Board's determination is supported by substantial evidence on the record, the Board is afforded the discretion to assess the damages that it finds are related to the violation.

When assessing damages, including the period of time for which damages should be assessed, the Board reasonably could have considered factors such as Ford's justification for terminating the Blue Oval payments, when and how Darling's learned of Ford's intent to terminate the payments, and whether Ford instituted an incentive program to compensate dealers for the loss of the payments. Here, upon review of the record and the Board's written decision, the Court can discern that when it determined the damages to which Darling's was entitled, the Board in fact properly considered Ford's purpose in terminating the payments, Darling's prior actual knowledge of Ford's intent to terminate the payments, and Ford's implementation of an alternative incentive program.

In its decision, however, the Board wrote that "it limited the damages to the 90 day notice period and the 180 day adjudication period contained in § 1174(3)(B)." While under the

6

circumstances of this case, the Board reasonably could have concluded that Darling's damages should be confined to a nine-month period, the Court cannot determine whether the Board believed it was statutorily required to limit Darling's damages to that time period, or whether in the Board's judgment, the Board determined it was reasonable to award Darling's damages for a nine-month period. If the Board concluded that it must limit the damages to a specific time period as a matter of statutory interpretation, the Board's decision generates a legal issue for the Court. *See FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶ 11, 926 A.2d 1197 (outlining standard of review for issues of statutory interpretation). If after considering the evidence of record, the Board concluded that it was appropriate to award damages for a nine-month period, the Board's decision presents a factual determination for review. *See Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 24, 15 A.3d 1263, 1271 (outlining standard of review for factual determinations). The Court thus cannot, without further clarification from the Board, review the issue. *Cf. In re Me. Motor Rate Bureau*, 357 A.2d 518, 527 (Me. 1976).[4]

The Court will, therefore, remand the matter to the Board for further findings as to the basis of its decision to award Darling's damages for a nine-month period. The Board is not required to take additional evidence on the issue.

---

[4] In *Maine Motor Rate Bureau*, the Law Court stated:

> In a case reaching us on appeal from the judgment of a court, we may uphold what we find to be a proper result, even if we disagree with the accompanying reasoning, for we may engraft our own rationale upon the decision reached. *Laferriere v. Paradis*, Me., 293 A.2d 526 (1972). However,
>
> > "in dealing with a determination or judgment which an administrative agency alone is authorized to make, [a court] must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain . . . set aside exclusively for the administrative agency." *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577, 91 L. Ed. 1995 (1947)[.]

357 A.2d 518, 527 (Me. 1976) (first alteration in original).

7

Finally, Darling's argument that the Board should have assessed multiple civil penalties because Ford's failure to provide written certified mail notice constitutes an ongoing violation of 10 M.R.S. § 1174(3)(B) is unconvincing. Title 10 M.R.S. § 1171-B(3) authorizes the imposition of a civil penalty of no less than $1,000, nor more than $10,000 for "each violation" of the applicable law. After concluding that Ford did not provide Darling's with proper notice of the termination of the Blue Oval payments, the Board assessed a civil penalty in the amount of $10,000. Darling's maintains that the Board should have assessed multiple penalties because Ford's failure to provide the notice constitutes multiple violations of 10 M.R.S. § 1174(3)(B). The alleged violation is Ford's modification of the franchise agreement without providing proper notice. Ford's failure to provide the notice constitutes one violation. The Board did not err when it assessed the highest civil penalty allowable under the statute for that single violation.

Conclusion

Based on the foregoing analysis, the Court remands the matter to the Board for further findings in accordance with this Decision and Order.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate the Decision and Order into the docket by reference.

Dated: 2/1/12

Justice, Maine Business & Consumer Court

Entered on the Docket: 2-7-12
Copies sent via Mail ___ Electronically ✓

8

Ford Motor Co. v. Darlings et al – Docket no's AP-08-01, AP-08-02 , AP-10-05

For Ford Motor Company
Daniel Rosenthal, Esq.
Marcus Clegg & Mistretta PA
One Canal Plaza, Ste 600
Portland ME 04101-4600


For Matthew Dunlap
Linda Conti, AAG
State of Maine
Office of the Attorney General
6 State House Station
Augusta ME 04333-0006

For Darling's
Judy Metcalf, Esq.
Eaton Peabody
PO Box 9
167 Park Row
Brunswick ME 04011